## BUSER et al. v. NOVELTY TUFTING MACHINE CO.

(Circuit Court of Appeals, Sixth Circuit. January 8, 1907.)

No. 1,523.

1. PATENTS—ANTICIPATION—ABANDONED EXPERIMENT.

Where the idea of a machine has been conceived, and the conception carried into effect by the construction of the machine, which is used, or is capable of being used, for the purpose for which it was designed, it is no longer an experiment, but an invention; and the subsequent abandonment of the use of the machine does not render it an abandoned experiment, nor lessen its effect as an anticipation which will invalidate a subsequent patent to another for substantially the same machine.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, §§ 71–73.

Abandonment of invention, see note to Hayes-Young Tie Plate Co. v. St. Louis Transit Co., 70 C. C. A. 6.]

SAME—FORGOTTEN INVENTION.

An invention which has been perfected by the construction of a machine, which was used in practical work for a number of years by the inventor and is still in his possession, and of which he had photographs taken, which he still preserves, does not lose its effect as an anticipation of a subsequent patent to another for substantially the same machine as one which has been finally abandoned and forgotten, although the inventor failed to realize the full value of the invention and after a time discontinued the use of the machine.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, §§ 70–74.]

SAME—TUFTING MACHINES.

The Pitner patent, No. 577,809, and the Freschl reissued·patent, No. 11,778 (original No. 620,070), for tufting machines for making tufted work in upholstering, *held* void, for anticipation and prior use, on evidence which established beyond a reasonable doubt that defendants made and used in their business, many years prior to the patents, a machine embodying all the essential features of those of the patents.

Appeal from the Circuit Court of the United States for the Southern District of Ohio.

Alfred M. Allen, for appellants.
Walter F. Murray, for appellee.

Before LURTON and SEVERENS, Circuit Judges, and COCHRAN, District Judge.

COCHRAN, District Judge. This appeal is from an interlocutory decree granting an injunction, with a reference for an accounting, in a suit for the infringement of certain patents, brought July 12, 1902. The appellee, also hereafter referred to at times as "plaintiff," owns said patents by assignment. They all relate to tufting machines; i. e., machines for making tufted work in upholstering in the furniture, carriage, and casket trades. They are six in number, to wit: No. 511,649, to H. B. Pitner, December 26, 1893; No. 577,809, to H. B. Pitner, February 23, 1897; No. 592,508, to A. Freschl, October 26, 1897; reissue No. 11,778, to A. Freschl, October 24, 1899; reissue No. 11,779, to A. Freschl, October 24, 1899; and No. 682,139, to A. Freschl, September 3, 1901. The suit as to the first Pitner patent was abandoned before the hearing. It was held that the first Freschl patent was not infringed, that the last two Freschl patents were invalid, and that the second Pitner patent, as to claims 5 and 6, and the second Freschl patent, as to all its claims, four in number, were valid and infringed.

The machine described in the second Pitner patent, No. 577,809, and to which it related, consists of four separate articles—a mold board, plaiters, a follow board, and a pin board. The mold board is an open box partitioned by strips into separate compartments, or pockets, of the shape desired for the rounded portions or "biscuits" of the tufted work, with hollow posts at the corners of the pockets, except at the outer edge, of the height to make the depression of the tufted work the desired depth, and longitudinally fluted on their outer side, and with openings in its base answering to the holes in the corner posts. The plaiters are hollow tubes recessed into downwardly projecting points at one end and adapted to straddle the corner posts and partition slips and enter the flutes of the corner posts. The follow board is a board

with openings in it answering to the corner posts of the mold board. The pin board is a board with pins or posts rigidly attached thereto, answering to the openings of the base of the mold board, and adapted to enter same and the holes of the corner posts. The mode of using the machine is this: The outer or upper cover of the cushion, with its finished face downwards, is placed in the mold board and depressed into the pockets; the plaiters are passed down over the cover and corner posts and into the flutes, so as to plait the cover and hold it in place; moss, or other suitable material, is filled in the depressions of the cover; the plaiters are removed; burlap, or other suitable material, is laid on the moss to form the inner or lower cover; the follow board is placed on top of the burlap, and the whole is removed to a press where the filling material is compressed into place; the mold board and follow board are clamped together and removed from the press; the tufting buttons, prongs upwards, are forced by means of the pin board through the openings in the base of the mold board and the holes in the corner posts, and through the lower and upper covers and there clinched, the holes in the follow board being large enough to permit this being done; and the finished work is then removed from the machine. Claims 5 and 6 of the patent are for the combination of a base provided with corner posts, referred to therein as "upwardly projecting tucking devices," and plaiters. The claims contain no limitations on the tucking devices, but do on the plaiters. The fifth calls for "detachable recessed plaiters which are adapted to straddle said tucking devices," and the sixth for "detachable plaiters provided at their lower ends with downwardly projecting points which straddle said tucking devices." This is the only difference between the two claims.

The machine described in the second Freschl patent, reissue No. 11,778, and to which it related, consists of a mold board, and all the claims thereof, four in number, relate thereto. They call for an imperforated base plate, as distinguished from the perforated base plate of the Pitner patent, with a plurality of upwardly projecting tufting posts attached rigidly to said plate; each post being provided at its outer end either with an upwardly projecting pointed pin held against lateral displacement and adapted to pierce both coverings, or with a seat for the head of a tufting button adapted to retain it against lateral displacement during the process of forming the cushion, and releasing it when removed from the mold board, and either with or without strips partitioning the mold board into separate compartments. The fixed pin is used when it is intended to sew the outer and inner covers together. In effect the construction is simply the pin board of the second Pitner patent, No. 577,809, with the addition of the upwardly projecting pointed pins or seats for the tufting buttons at the outer ends of the posts thereof and of the partitioning strips when used.

The appellants (Mattie H. Buser being the wife of W. E. Buser, and the Champion Bed Lounge Company being the name under which they did business), also hereafter referred to at times as "defendants," had filed in September, 1902, their answer, in which they denied infringement and alleged as follows:

"And for a second defense to plaintiff's bill of complaint, defendants say: That they have been continuously engaged at the city of Chillicothe, Ross

county, Ohio, in the upholstering business in the manufacture of chairs and lounges for a period of 25 years last past; and that all the machinery and apparatus that has been and is used by them in their said business, and also the methods of using same, are of their own discovery and invention, and have been so used by them in their said business in said city of Chillicothe, Ross county, Ohio, continuously for a period of 22 years last past." ·

Some time shortly after October 14, 1902, defendants had filed a supplemental answer, in which they set up that the defendant W. E. Buser obtained a patent for new and useful improvements in tufted machines, numbered 711,382, and alleged:

"That said patent letters include and embody in all the various appliances and apparatus used by defendants in their upholstering business, and also comprise and contain all the upholstering apparatus and methods used by defendant, of which plaintiff in its bill herein complains."

· This pleading, of course, presented no defense to the suit. Its sole effect was to·annul the denial of infringement contained in the answer and to relieve plaintiff of the necessity of proving it. It had this effect because it is apparent from an inspection of said patent that the apparatus described in it and to which it related is an infringement of plaintiff's two patents sustained and held to be infringed, and it is alleged that the apparatus in use by defendant is of that character. This left the second defense of the original answer as the only defense to the suit.

The defense which this portion of the answer set up was prior invention, and that by defendants. It is not, however, thus directly alleged therein. That portion of the answer contains three affirmative statements, to wit: That the defendants had been continuously engaged in the upholstering business in Chillicothe, Ohio, for 25 years last past; that all the machinery and apparatus that had been and were then used by·them in their said business, and the methods of using same, were of their own invention; and that they had been used by them continuously for a period of 22 years last past. Counsel differ as to the meaning of the last two statements, the material part thereof. Appellants' counsel contend that their meaning is merely that all the machinery and apparatus which the defendants had been for 22 years last past, and were then using, were of their own invention. So construed, they did not present the defense of prior invention, or any defense at all. According to this construction, it is neither alleged that the machinery and apparatus which the defendants were then using had been invented by defendants prior to plaintiff's invention, nor that the machinery and apparatus which the defendants had been using during said 22 years prior to plaintiff's invention anticipated plaintiff's patents. Appellee's counsel contends that their meaning is, not only that all the machinery and apparatus which the defendants had been and were then using were of their own invention, but also that the machinery and apparatus which they were then using had been used by them continuously for 22 years last past. So construed, they presented a defense, and that of prior invention.

This they did, not by direct allegation, but indirectly only. As counsel for appellee says, this defense "is an inference from the answer." Rather it should be said that it is an inference from the answer in con-

151 F.—31

nection with the bill. The bill alleged that the machinery and apparatus which the defendants were then using infringed plaintiff's patents. If so, and said machinery and apparatus had been used by defendants continuously for 22 years last past, then they anticipated plaintiff's patents by more than 15 years. With this construction we agree. We cannot agree, however, with the contention that the meaning was that the identical machinery and apparatus which the defendants were then using had been used by them continuously for 22 years last past. It meant no more than that machinery and apparatus substantially of the same character as that which they were then using had been used by them continuously for 22 years last past. It was treated in the lower court as admitting of proof of the use of other machinery and apparatus than that which they were then using, but substantially of the same character. Nor is it contended here that it did not admit thereof. The contention that it has such limited meaning is put forward only as affecting the credibility of the defendant W. E. Buser, who made oath thereto in the way hereinafter indicated. Nor was the allegation that such machinery and apparatus had been continuously used by them a material part of the defense. It was made out if the evidence warrants the conclusion that the defendants had, prior to the plaintiff's invention, used machinery and apparatus substantially of the same character as that they were then using; i. e., that anticipated, as that infringed, plaintiff's patents.

Appellants seek a reversal of the decree appealed from mainly on the ground that this defense was established by the evidence, and that the lower court erred in not so holding. In considering whether this position is well taken, it is to be borne in mind that the rule is that, in order to invalidate a patent by oral testimony of prior invention, it must be such as to convince one beyond a reasonable doubt of that fact. Washburn & Moen Mfg. Co. v. Beat 'Em All Barbed Wire Co., 143 U. S. 275, 12 Sup. Ct. 443, 36 L. Ed. 154. This court, in the case of American Roll Paper Co. v. Weston, 59 Fed. 147, 8 C. C. A. 56, invalidated a patent on oral testimony of prior use. And in the recent case of Columbus Chain Co. v. Standard Chain Co. (C. C. A.) 148 Fed. 622, it refused to uphold a later patent on oral testimony as to invention by the patentee thereof prior to an earlier one. Is, then, the evidence in this case sufficient to satisfy one beyond a reasonable doubt that plaintiff's patents were anticipated by defendants' prior invention?

It is certain that they were not anticipated by the construction and use of the machinery and apparatus which the defendants were using when the suit was brought. It consisted of a single tufting machine for making tufted couch seats, which they had constructed and put in use only a short time prior thereto. It was the machine described in patent No. 711,382, issued to defendant W. E. Buser October 14, 1902, and to which it related. Just how long it had been in existence and use does not definitely appear. Said defendant, in his testimony given in April, 1903, stated that before its construction they had purchased a Kelly machine, and that they had purchased it some three or four years before the time he was testifying; and in question put to him on cross-examination it was assumed that he had theretofore testified that said machine had been "built two or three years ago," which assumption was

ermitted to go unchallenged. There is no other evidence shedding any
ght on the question as to the time when said machine was constructed
nd put in use. It is to be inferred therefrom that it could not have
een much, if any, earlier than 1899 or 1900.

But the evidence was not confined to this machine. There was evi-
nce tending to show that said defendants had invented, and the de-
ndants had put in use, as much as 22 years before the answer was
ed—i. e., in 1880—a smaller tufting machine for making tufted
unge backs. It was substantially the same machine as said larger
d later one, embodying substantially the same ideas, and clearly
ticipated plaintiff's patent. It consists of a mold board, plaiters,
arp metal points on wooden pins, and a follow board. The mold
ard is an open box, partitioned by metal strips into separate com-
rtments or pockets, with corner posts, or upwardly projecting tuck-
g devices, at the corners of the pockets, except at the outer edge.
he corner posts are hollow, and the base of the mold board has open-
gs in it answering to the holes in the posts. But those holes and open-
gs are not for the purpose of passing buttons through them, nor are
ey adapted thereto. Their purpose is to permit the passage of the
arp metal points on wooden pins, heretofore referred to. The corner
sts are recessed so as to provide a seat for the head of the buttons.
hey have no flutes on their outside. The plaiters are recessed, and
ve downwardly projecting points at one end adapted to straddle the
rner posts. The sharp metal points on wooden pins are adapted to
ss through the openings in the posts and base of the metal board, and
 pierce the two covers. The follow board is not a single board,
t a framework with slats running crosswise and spaces between them.
It is thus seen that this machine has the combination of a base with
wardly projecting tucking devices, and of detachable plaiters re-
ssed, and with downwardly projecting points adapted to straddle
d devices, clearly anticipating, if earlier, claims 5 and 6 of the Pitner
tent. Likewise, in the sense of the Freschl patent, its mold board has
 imperforated base plate—i. e., it does not permit the passage of
ttons through it—with a plurality of upwardly projecting tufting
sts attached rigidly thereto, each post, when the sharp metal points
 the wooden pins are in place, being provided with an upwardly pro-
ting pointed pin held against lateral displacement, and adapted to
rce both covers of the cushion, and, when they are not in place,
ng provided with a seat for the head of a tufting button adapted to
ain it against lateral displacement during the process of forming the
hion, and releasing it when removed from the mold board—clearly
icipating, if earlier, the Freschl patent.

The only difference between this and the larger or later machine is
t the latter embodies the improvements covered by patent No.
,382, issued to W. E. Buser October 14, 1902. Those improve-
nts relate to the button holders, to the plaiters, and to the outside
tion of the frame. The button holders are solid, and have staples
their ends for holding the button. The plaiters have downwardly
jecting U-shaped wires. Otherwise the two machines are alike.
e question put, then, narrows itself to this: Is the evidence suf-
ent to convince one beyond a reasonable doubt that said smaller

machine was in existence and use by defendants prior to plaintiff's inventions?

The evidence tending to establish that it was consists of the machine itself, the testimony of the defendant W. E. Buser and of two of defendant's former employés, Charles S. Wachenschwenz and August Rumph, in regard thereto, two photographs of the machine, and the testimony of said defendant, of one W. A. Richardson, and of said Wachenschwenz in regard thereto, and a catalogue issued by the defendants. The machine itself was misplaced at the time of the preparation of the case and was not exhibited to the witnesses during the taking of the testimony. It was subsequently found and introduced at the hearing as the machine to which the evidence related. It looks old and genuine. There is nothing in its appearance to negative the fact that it had been constructed and put in use in 1880 as claimed.

The defendant W. E. Buser testified that he invented and made the machine in 1880 and defendants put it in use at that time. As to how long they continued to use it his testimony is somewhat indefinite. He stated that their main business was making lounges and their work was mainly plain work, that they had been doing tufted work more or less ever since they had been in business, that they had done very little such work, and that they used said machine for years continuously whenever they had any demand for that kind of work. At the conclusion of his testimony in chief, he testified as follows:

"Q. I will ask you how long you used the smaller machine that you conceived 18 or 20 years ago, the tufting machine?

"A. Six or seven years ago.

"Q. How long have you used this larger machine on which you now make couch seats?

"A. I mean the larger machine or model?

"Q. No; the large machine?

"Mr. Murray (Plaintiff's Counsel): The patent is dated—it is in evidence in the case—October 14, 1902.

"Q. Is there anything else you want to say about this?

"A. I don't know of anything else."

It is possible that witness intended to be understood as saying that he had used the smaller machine until six or seven years ago, or that he used it six or seven years. Appellants' counsel contends that his meaning here was that they used the large machine—the one shown in the patent—six or seven years ago, and he did not say how long they used the smaller machine. But, in view of the testimony as to when the larger machine was made and put in use, heretofore referred to, it can hardly have this meaning. The best we can make out if it is that the witness intended to be understood as saying that they had used the smaller machine "until six or seven years ago," the stenographer failing to catch the word "until" and using the word "I" instead of "You" in the next answer; that being an interrogatory as appears from the interrogation mark at its end. This conforms to his former answer that they had used it continuously for years whenever they had any demand for tufted work.

The two former employés of defendants, Charles S. Wachenschwenz and August Rumph—the former of whom worked for defendants about 6 years, beginning in 1880, when he was 13 or 14 years of age, and the

ter of whom, then a locomotive engineer and having been such for years, worked for defendants about 2 years, beginning in 1882 or 83, when he was about 15 years of age—each testified as to the use the machine during their employment in making lounge backs in lfted work, and that they worked in connection with it in pulling or icking and loosening the moss for it. As stated, when said defendant and those two witnesses testified, the machine was misplaced and ot exhibited to them. Each of these three witnesses described the machine and the method of its use; said defendant going into great letail. Their description is lifelike and realistic, and conforms to the machine. Certain detached parts of said machine, to wit, a corner post, a metal strip, and a plaiter, claimed to have been used in connection with the machine and which had not been misplaced, were identified by these three witnesses.

One of the two photographs of the machine is of the mold board, with plaiters in place and lying on it, and the other of the follow board. A comparison of these two photographs with the machine itself shows that they are photographs thereof. This is not questioned. The defendant W. E. Buser testified that he had the photographs taken about the year 1881 by F. A. Simonds, a photographer then doing business in Chillicothe, Ohio, and who died July 13, 1884. Said W. A. Richardson, who worked for said Simonds from December, 1871, until his death, testified that he took the photographs himself in January or February, 1881. And said Wachenschwenz testified that in 1880 or 1881 he carried the machine to Simonds' gallery to be photographed, and identified the photographs. They are mounted on Simonds' cards. The defendant W. E. Buser gave as the reason for having the photographs taken that it was his habit to have photographs taken of his machines as "keepsakes," and both he and Richardson testified to an incident in connection with the taking of the photographs involving a certain Dr. Clough, a friend of the former. The catalogue, which shows on its face that it was issued whilst defendants were doing business at 22 Paint street, Chillicothe, from which they moved to another place in said city in the year 1885, has a cut in it of a lounge with a back in tufted work.

Such, then, is the evidence in support of the defendants' claim that said machine was invented and put in use as early as 1880, and more than 15 years prior to plaintiff's invention. In the absence of considerations or circumstances affecting its force or opposing evidence, it is sufficient to convince one beyond a reasonable doubt of the correctness of that claim. There is no opposing evidence. Reliance is had simply on certain considerations and circumstances which it is thought affect and weaken the force of said evidence to the extent of raising a reasonable doubt. We will take them up in detail and determine their effect. As to the catalogue, it is suggested that it shows no more than that defendants were making lounge backs in tufted work prior to 1885. This is true. For aught that it shows, defendants may have made such lounge backs prior to that date by hand, the old way of making tufted work before the day of machines. But this fact is to a certain extent a corroborating circumstance, not of great weight, yet of some. As to the photographs, it is claimed that they present evidences

on their face that they were not taken as testified to by defendants
witnesses, some of which conduce to show that they were taken by an
amateur, and not by a professional photographer, and others that they
have been made for the purposes of this case. The evidences of ama-
teurishness relied on are that neither of the articles photographed ap-
pear in the center of the paper; that the print of the follow board was
too long for the card on which it is mounted, and part of it had to be
cut off, and that both prints are irregularly cut along their edges.
These criticisms are well taken. But this condition of things may be
accounted for by the fact that they were taken, not by Simonds, but
by Richardson, his employé, who, though he had been working for
Simonds about 9 years, was then possibly not more than 21 years of
age, and that the things photographed may not have been regarded as
calling for much care. The evidences of fraud relied on are that the
cards are soiled and the prints not; that in some instances the soiled
marks extend underneath the prints, where they can be raised from
the cards; and that the edges of the photographs appear as though
they were cut in recent years. We have examined the photographs
carefully, and are unable to find any soiling marks under the prints,
or any evidences of recent cutting. Nor can we say that there is an
entire absence of soiling marks on the prints. In so far as they present
a fresher appearance than the cards on which they are mounted, this
may be, and no doubt is, due to the nature of the different materials.
The surface of the cards is calculated to be soiled much sooner and
greater than the prints.

Then, again, it is said that the photographs show nicks and stains
on the mold board and follow board, and that the photograph of the
mold board shows certain of the partitioning strips to be irregularly
placed, and that the mold board and follow board show exactly these
same peculiarities. From this it is argued that the machine could
have been used but little, if any, after the photographs were taken. If
they had been used much, those peculiarities would have been effaced
or changed. This, however, conforms to the testimony as to their use.
The defendant W. E. Buser testified, as heretofore stated, that they
were very little used, as they did not do much tufting work. It is
thought that the testimony of Richardson and Wachenschwenz as to
the taking of these photographs, and the time when they were taken,
is affected by the fact that defendants were in the habit of having
machines and manufactured articles photographed at Simonds. Just
how much photographing they had done there is not shown with any
definiteness. But there is no evidence that Richardson took any other
photographs than those in question, or that Wachenschwenz carried
any other machine or any manufactured articles to be photographed.
The date when they were taken is immaterial. If taken at any time
whilst Richardson was in Simonds' employ, or Wachenschwenz in de-
fendants,' they prove the existence of the machine long prior to plain-
tiff's invention. But Richardson fixes the time by the fact that they
were taken just after Simonds had moved from one place of business
to another, and the time testified to was at the beginning of Wachen-
schwenz's employment.

As to the testimony of Wachenschwenz and Rumph in regard to the machine and its use, it is claimed that they had been coached, and had seen the larger machine before testifying. There is no evidence of either. A model of the larger machine was exhibited to both when testifying, and in describing the smaller machine each, in one instance, referred to said model. Their testimony presents no evidence of artificiality. Then, as to the testimony of the defendant W. E. Buser, it is claimed that its value is affected by certain statements made by him under oath, which are claimed to be contradictory and inconsistent with his testimony herein, and by certain actions on his part. The statements relied on are one of those contained in his affidavit to his application for patent No. 711,382, and one of those contained in that portion of his answer hereinbefore referred to, and are as follows: That in the affidavit being that the improvements in tufting machines described and claimed in the annexed specification had not been in public use for more than 2 years prior to the application; and that in the answer, that the machinery and apparatus which the defendants were then using had been used by them for 22 years last past. We fail to see any contradiction in those two statements, or any inconsistency of either with his testimony. The statement of the affidavit is simply that the improvements in tufting machines described and claimed, which were sought to be patented, had not been in public use for more than 2 years prior to the application. Nothing is said as to the machine itself, to which the improvements related. As to the meaning of the statement in the answer, we have heretofore indicated our view. It is not that the identical machinery and apparatus, which the defendants were then using, had been in use by them for 22 years last past. This was not true, and the defendant could not have intended to make a statement to that effect. What was meant was that machinery and apparatus substantially, or in all important particulars, like that then in use by them, or embodying substantially or in all important particulars the same ideas, had been so in use by them. So construed, said statements are consistent with each other and with said defendants' testimony. It is only by construing the statement of the answer as meaning that the identical machinery and apparatus which the defendants then had in use had been so used by them that any trouble arises, and the inconsistency it brings about is, not between that statement and that of the affidavit, but between it and said defendants' testimony.

Then as to the actions of said defendant relied on as affecting the value of his testimony. They are as follows: His purchase of the Kelly machine, hereinbefore referred to; his visit to a licensee of plaintiff at Columbus, Ohio, in the early spring of 1900, to see its machine, with the ostensible purpose of determining whether he would buy one; his efforts at concealment from plaintiff that he was using a tufting machine and its character; his not disclosing to his attorney, who obtained patent No. 711,382, the fact as to smaller and older machine; and his treatment of one Edward J. Meyer, a former employé of defendants, who had furnished plaintiff in June, 1902, just before suit was brought, an affidavit as to the character of machine they were using. It is urged that it is improbable that defendants

would have purchased a Kelly machine, or that said defendant would have visited Columbus, Ohio, to see plaintiff's machine, with a view to purchase, if the defendants already had a machine. It would seem that said defendant's visit to Columbus was only ostensibly for the purpose of determining whether he would buy one of plaintiff's machines, and that such was not his real purpose. He never negotiated for said machine, and though plaintiff, after being informed by its licensee of his visit, wrote defendant four letters about buying one of its machines, he never received any answer thereto. But plaintiff proved itself that about this time defendants had a machine. It proved that on the occasion of a visit of its president to Columbus, in June, 1900, he inquired of said defendant's nephew, then there, what kind of a tufting machine defendants were using, who said that they did not have any, and when he left him plaintiff's licensee's son said:

"That young fellow is a liar. I was in their factory, and saw the tufting machine, and saw a machine exactly like ours."

What said defendant's real purpose, in wanting to see plaintiff's machine, was, is not disclosed. He was not asked about it on cross-examination. It was not proven by plaintiff until after he had testified. And as soon as plaintiff had taken its testimony, the taking of proof was closed on its motion, and a motion on defendant's part to enlarge the time for taking testimony to rebut the testimony taken by plaintiff was overruled. So that said defendant has never had an opportunity to explain the purpose of these visits. He was asked about the purchase of the Kelly machine on cross-examination, and his explanation thereof was that the solicitor for that machine called upon him to sell it to him, and asked $200; that in response he said he would not give him $50 for it; that afterwards the solicitor came to him, and claimed that he had offered $50, and wanted him to take it, and threatened to sue him if he did not; and that, in order to avoid a lawsuit, he purchased it, and defendants had never used it.

As to said defendant's efforts at concealment from plaintiff that he was using a tufting machine and its character, what was done in this line was this: Upon a call from plaintiff's president, after he became suspicious that defendants had a tufting machine, he refused to tell him what they had or let him in the factory, and two men, hired by plaintiff to get employment in defendants' factory for purpose of ascertaining what kind of a machine he was using, could not get in. It is urged that, had the facts been as defendants claim them to have been, said defendant would not have wanted to conceal such knowledge from plaintiff. All explanations from said defendant on this score were cut off by the order closing the testimony heretofore referred to. It may have been due to not knowing defendants' rights, or a desire to conceal the improvements for which said patent was then in contemplation or pending, or to the ordinary business jealousy of concealing from a rival what one is doing.

As to said defendant not telling his attorney, who obtained No. 711,382 for him, about the smaller and old machine at the time he employed him to make his application, there is this to be said: There is no direct evidence that he did not. On the contrary, there is direct

evidence that he did.   Said defendant so testifies.   The sole evidence
relied on as showing that he did not is a letter written by him to said
attorney after this suit was brought.   In that letter he tells him about
the machine.   Appellee's counsel contends that he tells it as if he had
never mentioned it before.   There is some basis for this contention,
but not sufficient, we think, to overbalance his testimony that he had
theretofore mentioned it.   Besides, the circumstance of his not telling
said attorney is not of much weight in the case.   The patent was only
for certain improvements on the machine, and there was not much oc-
casion for his giving him a detailed history of it.

And, finally, as to his treatment of said Meyer.   The plaintiff,
through its president, was seeking evidence that defendants were using
a tufting machine infringing its patent.   It had much difficulty in
doing so.   Efforts made in this direction have been heretofore referred
to.   Finally, in Chillicothe, it came across said Meyer, a former em-
ployé of defendants, who began to work for them at the age of 15
in the year 1888, and worked for them almost continuously until 1898,
when he left, returning again in 2 or 3 years, and working until about
3 months before suit was brought, and obtained an affidavit from him
that defendants were using a tufting machine, as to its character and
the amount of work being done with it, on the basis of which this
suit was brought.   It obtained this affidavit in consideration of a writ-
ten pledge to provide him with a job in Chicago, which soon after-
wards was complied with.   Thereupon said defendant had Meyer in-
dicted for perjury and brought back to Chillicothe, and during the
few months that he was there obtained two affidavits from him, ex-
plaining the circumstances under which the former affidavit had been
obtained, and repudiating its statements, and causing him to send let-
ters to plaintiff soliciting money, with a view to getting a hold upon it.
This is Meyer's account of matters.   Meyer had stolen a contribu-
tion box from a church in Chillicothe, and committed burglary there,
about the time he began to work for defendants, and at the time he
figures in this case he was addicted to drinking.   In view of his history,
of his having been bought with a job to give said first affidavit, of his
giving contradictory affidavits, and of his suffering himself to be made
a tool to obtain money from plaintiff to its hurt, according to his own
account, his testimony is to be received with great caution, if, indeed,
any reliance is to be placed on it at all.

The defendants were cut off by the order heretofore referred to
from offering any rebuttal evidence.   But there would seem to be no
doubt that said defendant procured said indictment for perjury and
obtained from Meyer said two affidavits; they being introduced in evi-
dence by defendants on his cross-examination.   In procuring the in-
dictment it is possible that a wrong was done Meyer, and certainly
the two affidavits were untrue—one in so far as it stated that many of,
and the other in so far as it stated that all, the statements in the af-
fidavit given plaintiff were false.   On the contrary, said affidavit was
in the main true.   It related almost entirely to the character of the
tufting machine which the defendants were and had for three years
past been using, and the work that was done with it and its statements
in regard thereto coincided with said defendant's own testimony herein.

This conduct on his part is to be condemned. It was a reprehensible effort to destroy a possible witness against defendants in their litigation with plaintiff. It was possibly a case of fighting the devil with fire, and is an instance of the length to which litigants will sometimes go in order to overcome their adversary. Yet, notwithstanding all this, we do not deem it sufficient to weaken the unhesitating conviction, induced by the evidence heretofore recited, that said small machine was made and used as it tends to show. It is just as possible that said defendant's conduct was due to the feeling of uncertainty that many litigants have as to the outcome of the litigation in which they are engaged as to any consciousness that said machine was not so made and used.

Besides these considerations, there are two others relied on as affecting the force of said evidence. One is the great improbability that said defendant could, as the result of one effort, have invented said machine, or that, if he had, he would have failed to realize its great value, as he did in confining its use to himself and not having it patented and putting it on the market. According to plaintiff's testimony it is a highly valuable machine, and the effect of its machines constructed on the same lines was to revolutionize the art of making tufted work. Before they came upon the market—i. e., prior to 1894—all tufted work was made by hand. By means of said machines 30 to 40 per cent. more work is enabled to be done than was formerly done by hand, and unskilled labor can do the work now that was done before by skilled. Here, as in case of the other facts presented by plaintiff's testimony, all light has been shut out that might have come from the opposite side. It is thought remarkable that defendants did not realize the great value of said machine, and still more so that by a single effort he should have invented that which it took the combined efforts of two inventors, Pitner and Freschl, over a number of years, by a series of steps, to produce. The first step was that embodied in the first Pitner patent, No. 511,649. It had the mold board, with pockets and holes in its base at the corners thereof, but was without corner posts and plaiters for forming plaits and holding them in place whilst the moss was being filled in, and hence was impractical. Then came the second Pitner patent, No. 577,809, with the corner posts and plaiters, thus overcoming the defects of the prior patent. But it had to be taken from the press and to a bench for completion of the work. Then came the first Freschl patent, No. 592,508, in which the mold board was held elevated over the pin board by cams whilst the cushion was being made and compressed, and then by removal of the cams was allowed to descend and force the tuft buttons, held in place by prongs on ends of posts of pin board, into place. And finally came the second Freschl patent, reissue No. 11,778, which it is claimed put tufting in most satisfactory form, dispensing entirely with a separate pin board. This perfected machine, according to defendants' claim, was produced by said defendant at one effort, or, as appellee's counsel puts it, "from the head of this man there sprang, 'Minerva like,' the idea of the fully developed machine." All that is claimed as to the strangeness of this happening, and as to the improbability thereof, and that the value of the machine was not realized, may be conceded, and yet this circum-

stance does not weaken the force of said evidence. An improbable fact, properly verified, is not to be rejected because of such improbability.

The other consideration referred to is that in the first Pitner patent the term "follow board" is applied to one of the elements of the machine described therein, and according to said defendant that same name was given by defendants to the same element years before. It is thought to be peculiar and remarkable that two different persons, acting independently, should give the same name to the same element of the machine. It is a very appropriate name, expressive of the fact that it followed the other operations in the process of making the cushion, and it would seem not at all unlikely that it should occur to different persons without suggestion by one to the other. If, however, it is improbable that this should happen, the same suggestion is to be made here as in reference to the foregoing consideration.

This exhausts all the considerations relied on by appellee as affecting the force of said evidence in support of said defense. It has been said that there is no opposing evidence. But it may be thought that there is one piece of evidence that may be said to oppose said favoring evidence, and some notice should be taken of it. That is the testimony of said Edward J. Meyer, who testified on behalf of plaintiff, that whilst he worked for defendants, between 1888 and 1898, they used no tufting machine, but made all tufted work by hand, and it was only after he returned, upon an absence of two or three years, in 1900 or 1901, that they used a machine, to wit, the large machine. This evidence opposes no evidence introduced on behalf of plaintiff, unless the evidence of said defendant as to the use made of the small machine be construed to cover time after 1888. In view of the considerations heretofore referred to, affecting the credibility of this witness, possibly his testimony as to this fact should be given no consideration. Yet it is possible for even such a witness to tell the truth, and it is met here only by the indefinite and somewhat ambiguous testimony of said defendant as to the length of time that the small machine was used. Besides, it is somewhat significant that defendants introduced no witness, other than said defendant, by whom it attempted to prove any use of that machine after the year 1886. It was not material to prove any use of it after the date of plaintiff's patent. Nor, with it proven beyond a reasonable doubt that said machine had been in existence and use from 1880 to 1886, was it material to prove its use during the 11 years between 1886 and 1897. But, with the fact of its prior existence and use contested, it is rather strange that defendants did not strengthen their case by proving its existence and use by the testimony of persons in its employ during that period of 11 years, if it is a fact it had been then used.

It must therefore be conceded that it is possible that it was not used, as Meyer testifies, from 1888 to 1898, and that, so far as tufted work was then made by defendants, it was made by hand. One can hardly say that he has an unhesitating conviction that Meyer is not telling the truth in this particular. In this connection it is to be noted, further, that it was in March, 1898, that plaintiff began putting its tufting machines on the market and sending its circulars and booklets setting

forth the value of its machines, and that it sent this advertising matter to the defendants before the construction of the larger machine which they had in use when the suit was brought. It must be conceded, further, therefore, that it is a possibility that the receipt of this information was the occasion, at least, of defendants realizing the value of their old machine and causing them to construct the new one with its improvements. It is certain that only a short time thereafter said machine was constructed and put in use. One can hardly say that he has an unhesitating conviction that this is not so. These possible features of the case present plaintiff's counsel with another and final position, and it is here that he takes his last stand. That position is that, at most, said small machine was either an abandoned experiment or a forgotten invention, and hence that the defense of want of novelty is not made out.

These two things are entirely distinct, and in argument the distinction between them is not clearly noted. In order that it may be, we will consider them one at a time in relation to said position. An abandoned experiment is an experiment that has been abandoned. As a mere experiment never amounts to anticipation, the epithet abandoned here is unnecessary. What constitutes an experiment is indicated by the language of Mr. Justice Swayne in the case of Coffin v. Ogden, 18 Wall. 120, 21 L. Ed. 821:

"The invention or discovery relied on as a defense must have been complete and capable of producing the results sought to be accomplished. If the thing were embryotic or inchoate, if it rested in speculation or experiment, if the process pursued for its development had failed to reach the point of consummation, it cannot avail to defeat a patent founded upon a discovery or invention which was completed, while in the other case there was only progress, however near that progress may have been approximated to the end in view. The law requires, not conjecture, but certainty. If the question relate to a machine as thus exhibited, the conception must have been clothed in substantial forms, which demonstrate at once its practical efficiency and utility."

And again:

"Until his work is done, the invention gives nothing to the public."

If, however, the machine or other thing is complete, and capable of producing the result sought to be accomplished, it has passed the experimental stage and becomes an invention; and, in order that it may constitute an anticipation, it is immaterial how well it becomes known or how much it is used. Mr. Justice Swayne in the same case said:

"The prior knowledge and use by a single person is sufficient. The number is immaterial."

In the case of Reed v. Cutter, Fed. Cas. No. 11,645, Mr. Justice Story said:

"If the invention is perfected and put into actual use by the first and original inventor, it is of no consequence whether the invention is extensively known or used, or whether the knowledge or use thereof is limited to a few persons or even to the first inventor."

Walker on Patents, § 71, says:

"Novelty is negatived by prior knowledge and use in this country by even a single person of the thing patented. This rule applies even to cases where

that knowledge and use were purposely kept secret; and it applies, no matter how limited that use may have been."

Indeed, it has been held that if the alleged invention is complete, and capable of producing the results sought to be accomplished, though it may never have been used, it is an invention and an anticipation. In the case of Stitt v. Easton R. Co. (C. C.) 22 Fed. 649, Judge Colt said:

"If the constitution of the prior thing of itself demonstrates that it is within the principle of the patent, then, perhaps, no use need be established; for it might be said to prove itself. It is not necessary that the prior invention should have been actually used for the purpose contemplated, but it must have been capable of such use."

If, then, an alleged invention is in fact an invention, no subsequent abandonment of it can be said to be an abandoned experiment. At most, it is an abandoned invention. But an invention that has been abandoned is as much an anticipation, and to as great an extent negatives novelty, as an invention that has not been abandoned. In the case of Gayler v. Wilder, 10 How. 496 (13 L. Ed. 504), Mr. Chief Justice Taney said:

"We do not understand the Circuit Court to have said that the omission of Connor to try his safe by the proper tests would deprive it of its priority; nor his omission to bring it into public use. He might have omitted both, and also abandoned its use, and been ignorant of its value; yet, if it was the same with Fitzgerald's, the latter would not upon such ground be entitled to a patent."

In the case of Rich v. Lippincott, Fed. Cas. No. 11,758, Mr. Justice Grier, in charging the jury, said:

"If the original inventor of a machine abandon the use of it, and does not take out a patent first, no other person can entitle himself to a patent for it."

In the case of Shoup v. Henrici, 22 Fed. Cas. 26, Judge McKennan said:

"This is all that is required to take it out of the category of abandoned experiments. Its use might be altogether discontinued, but this would only leave it open to the public use. Certainly no subsequent inventor could take it up and appropriate it exclusively."

In coming, then, to the case in hand, there is no possible room to claim that said small machine is a mere experiment, subsequently abandoned. It was complete, and capable of producing the results sought to be accomplished by it, and was in use in making tufted work for at least six years. The evidence clearly establishes this. Appellee's counsel contends that the machine was impractical, and for this reason was abandoned. He bases this contention on the opinion of appellee's president, a practical upholsterer of much experience with tufting machines and the patentee in the Freschl patent. The grounds upon which said witness based this opinion were that the corners of the tin partitions would cut through soft goods, or scrape the leather when used as the cover; that in striking the shank of the tack buttons, supported only around the edge in the recesses of the hollow corner posts, the head of the tack would be pushed through the metal covering; and that the openings between the slats of the follow board were too wide. This opinion was not based upon any trial of the ma-

chine, but upon observation of the photograph and model of the larger machine. It should not, however, prevail against the testimony of the successful use of the machine. And, even if said deficiencies existed, it cannot be said that they were sufficient to prevent the machine from being an anticipation. Said machine, therefore, was not an abandoned experiment. At most, it was an abandoned invention. But that, as we have seen, is as much an anticipation as a nonabandoned invention.

Then, as to the claim that said machine was a forgotten invention, the doctrine of forgotten invention was introduced by the decision of the Supreme Court in the case of Gayler v. Wilder, supra. It is presented by Mr. Chief Justice Taney in a "provided" clause, immediately following the quotation from his opinion heretofore made, forming a part of and concluding the same sentence, and is in these words, to wit:

"Provided Connor's safe and its mode of construction were still in the memory of Connor before they were recalled by Fitzgerald's patent."

And again in these words:

"For, if the Connor safe had passed away from the memory of Connor himself and of those who had seen it, and the safe itself had disappeared, the knowledge of the improvement was as completely lost as if it had never been discovered. The public could derive no benefit from it until it was discovered by another inventor. And if Fitzgerald made his discovery by his own effort, without any knowledge of Connor's, he invented an improvement that was then new, and at that time unknown; and it was not the less new and unknown because Connor's safe was recalled to his memory by the success of Fitzgerald's."

He stated that an inventor in such a case was to be regarded as standing upon the same ground with the discoverer of a lost art, or an unpatented and unpublished foreign invention, and, like him, entitled to a patent, and that he was to be so regarded because "there was no existing and living knowledge of the improvement or its former use at the time he made the discovery." The Supreme Court in that case did not itself pass on the question as to whether the prior invention had become a forgotten invention, but determined only that it was proper for the lower court to submit the question to the jury. The circumstances which it was held authorized its submission were referred to by Judge Taney in these words:

"Although Connor's safe had been kept and used for years, yet no test had been applied to it, and its capacity for resisting heat was not known. There was no evidence to show that any particular value was attached to it after it passed from his possession, or that it was ever afterward used as a place of security for papers; and it appeared that he himself did not attempt to make another like the one he is supposed to have invented, but used a different one."

He said that they were introduced as evidence tending to prove that the Connor safe might have been "finally forgotten." Justices McLean and Daniel dissented from the holding.

In the case of Coffin v. Ogden, supra, the quotation first made herein from Mr. Chief Justice Taney's opinion, together with the "provided" clause, which set forth the doctrine of forgotten invention, and which concluded the sentence, were quoted by Justice Swayne in his opinion. As to said "provided" clause he said:

"Whether the proposition expressed by the proviso in the last sentence is a sound one, it is not necessary in this case to consider."

Thus, seemingly, he cast a doubt upon the doctrine. Walker on Patents (1st and 2d Eds.) § 71, states the doctrine as an exception to the rule as to the effect of a limited use of an invention on the novelty of a later invention. He refers to it in these words:

"In Gayler v. Wilder, the Supreme Court announced an exception to this rule, but in a later case intimated a denial, or at least a doubt, of the validity of that exception. According to the opinion of the majority of the courts in the first case, a single instance of prior knowledge and use will not negative novelty, if that use had ceased when the patent was granted and that knowledge was forgotten until called to mind by the reinvention. Justices McLean and Daniel dissented from that conclusion, and it will probably always be found impossible to fairly answer their arguments."

Robinson on Patents, vol. 1, p. 323, states the rule with approval in these words:

"The length of time for which an invention has been lost, and the degree of public ignorance which may prevail, are of no consequence, provided, only, that it be actually lost out of the practical knowledge of the public. Thus, if an art or instrument has been invented and employed in this country within the present generation, and then has been abandoned and forgotten, though its invention recalls it to the memory, not only of its first inventor, but of those who were once familiar with its use, it is a new invention, and is now conferred upon the public as if never known before. Even although the original instrument was not destroyed, but meanwhile has remained disused and unremembered, and since the publication of the latter has been recovered and employed, and manifests the same idea of means, it cannot negative the claim of the latter to have produced a new invention and to have been the true and only benefactor of the public."

The doctrine has probably never been applied in a subsequent case. Appellee's counsel cite the cases of Cahoon v. Ring, Fed. Cas. No. 2,292, Hall v. Bird, Fed. Cas. No. 5,926, Hartshorn v. Tripp, Fed. Cas. No. 6,168, and Davis v. Brown (C. C.) 9 Fed. 647—the first a decision of Judge Clifford, and the other three decisions of Judge Blatchford—as applications of the doctrine. Possibly it may be said that the doctrine is approved in those cases. But a careful examination of the facts thereof, we think, will disclose that they were all cases of abandoned experiment. In order to the proper application of the doctrine, the vital thing to be understood is: What is meant by "forgotten," or, as Mr. Chief Justice Taney puts it, "finally forgotten"? It certainly does not mean that the value of the invention has not been realized and its use has been abandoned. Judge Taney says, that these facts are not sufficient of themselves to prevent anticipation, if the invention is still in the memory of the prior inventor; thus recognizing that its value may not have been realized, and its use may have been abandoned, and yet it may still be in the memory of the inventor. Robinson says that it must be both "abandoned and forgotten," or "disused and unremembered." Possibly light is thrown on the meaning of the word by the fact that a forgotten invention is likened to a lost art or an unpatented and unpublished foreign invention. Mr. Justice Grier, who was one of the majority in Gayler v. Wilder, in the case of Rich v. Lippincott, supra, involving the same patent as that involved in that case, in charging the jury, said that it was necessary that knowl-

edge of the invention should be "as completely lost as if it had never been discovered." It would seem, therefore, that, by "forgotten" is meant something more than simply out of mind; i. e., not consciously present in the mind at all times. No one carries all his past experiences consciously present in his mind at all times. The necessities of this case, however, do not require that we pursue this line of thought farther.

Again, the proper application of the doctrine requires it to be settled on which party lies the burden as to the matter of forgetting. As it is an avoidance of the fact of prior invention, is it on the patentee to allege and prove, or must the party alleging prior invention also allege and prove that it was not forgotten, and must he prove this fact, as well as that of prior invention, beyond a reasonable doubt? This question we do not feel called upon to settle. In any view of the matter, we think that it is clear that this case does not come within the doctrine of forgotten invention. Assume that defendants did not realize the value of the invention, that they abandoned its use, and that they were caused to realize its value by plaintiff's advertisement; still it was not a forgotten invention. Though the machine seems at some time or other to have become misplaced, yet the photographs had not. They had been taken as a "keepsake," as said defendant terms it, of the machine and had been preserved. They disclosed completely the nature of the machine and its method of construction, and were a constant reminder of its former existence and use and mode of operation.

We have thus carefully considered every position advanced on behalf of appellee, and we are constrained to hold that its patents were anticipated by said machine and are invalid.

The decree appealed from is reversed, and the cause remanded for further proceedings consistent herewith.