## BONNOT CO. et al. v. LOPULCO SYSTEMS, Inc., et al.

(District Court, D. Delaware. November 26, 1926.)

No. 529.

I. Patents ⊂⟹130—Date of application for amendment held effective date of patent, where claims were built wholly on amendment.

Where all claims of patent were built on amendment of original application, wholly foreign to original disclosures, effective date of patent was that of application for amendment.

2. Patents ⊂⟹109—Amendment entirely changing originally disclosed process and device is invalid.

Amendment of patent, changing originally disclosed process and principle of device in which process was to be employed, so as to cause it to function in different way to produce different result, is invalid.

3. Patents ⊂⟹328—Patent 1,460,916, for method of burning pulverized fuel, held invalid for anticipation.

Patent 1,460,916, for method of burning pulverized fuel, held invalid for anticipation.

4. Patents ⊂⟹328—Patent 1,441,703, for furnace for burning pulverized fuel, held invalid for anticipation.

Patent 1,441,703, for furnace for burning pulverized fuel, held invalid for anticipation.

5. Patents ⊂⟹19—Mere increase in size does not involve patentable novelty.

Mere increase in size does not involve patentable novelty.

In Equity. Suit by the Bonnot Company and another against the Lopulco Systems, Inc., and another. Decree for plaintiffs.

Charles Neave, of New York City, Green & McCallister, of Pittsburgh, Pa., and William G. Mahaffy, of Wilmington, Del., for plaintiffs.

Synnestvedt & Lechner, of Philadelphia, Pa., and Ward, Gray & Ward, of Wilmington, Del., for defendants.

MORRIS, District Judge. The Bonnot Company and the Hagan Corporation, engaged in the manufacture and sale, respectively, of pulverized fuel burning apparatus, the purchasers of which were threatened with infringement suits under patents Nos. 1,441,-703 and 1,460,916, then owned by Locomotive Pulverized Fuel Company,[1] filed their bill in equity against that company to perpetuate the testimony of certain witnesses relating to the prior public use of the apparatus and processes of those patents. In its answer the defendant set up by way of counterclaim infringement by the plaintiffs of all the claims of each patent. Thus the suit became the usual infringement suit in equity, save that here the owner of the patents is the defendant and the plaintiffs are the alleged infringers.

---

[1] Pending the litigation, the title to the patents in suit was assigned by the original defendant, Locomotive Pulverized Fuel Company, to Lopulco Systems, Inc., and the assignment and a license agreement between that company and Combustion Engineering Corporation put in evidence. The assignee and licensee, by proper proceedings had, became the parties defendant or counterclaimants, entitled to the benefit and bound by all the proceedings in the cause.

The earlier patent, applied for February 5, 1918, and granted January 9, 1923, is for an apparatus or furnace for burning pulverized coal. The later patent, applied for April 27, 1921, granted July 3, 1923, and asserted by the defendant to be a division of the former, is for methods of burning that fuel. On December 11, 1922, the original application was amended by striking out certain paragraphs and by adding the matter now appearing from line 98, page 2, to line 13, page 3, both inclusive, of the apparatus patent. The plaintiffs say that the amendment was not an amplification of the original disclosure, but was a departure therefrom, constituting new matter; that all the claims of that patent rest in whole or in part upon the amendment, and that they are, hence, invalid.

The plaintiffs further assert that the process patent is not entitled to the benefit of the filing date of the 1918 application, in that it, too, rests upon the amendment to that application, not upon the original disclosure, and that more than two years before the application for the process patent was filed the methods of burning pulverized fuel therein claimed were in public and successful use. Again, the plaintiffs say that the disclosures of the original application and the disclosures of the amendment and of the process patent were all anticipated by prior public use at the Phipps power plant in Pittsburgh from 1910 to 1912, by an article in "Power" for February, 1911, illustrating and describing the furnace and method therein employed to burn pulverized coal at that plant, and that the original disclosure was anticipated by prior public use at the Calumet Steel Company plant.

The key to the solution of the problem— Do the amendment to the original disclosure and the specification of the process patent consist of new matter, and not a mere amplification of the original disclosure?—is, the plaintiffs contend, to be found in the answer to the inquiry: Was not the original disclosure restricted to the employment of an intensely hot, hard, short flame, and the amendment and the process patent to the lazy, slow-burning, temperature-controlled, stream line, long, soft flame? The defendant asserts and the plaintiffs deny that the original disclosure covered the long-flame process and a furnace operating upon the long-flame principle.

The hard flame, with localized intense heat, results whenever the combustion of the mass of fuel is rapid. It is a consequence of providing an immediate, ever-present, fresh

supply of oxygen to the burning particles of fuel. It is brought about by constant rapid mixing of air and fuel. Its effect is a melting and destruction of the refractory walls of the furnace, and usually, too, a fusing of the refuse, rendering it difficult to remove. The long, soft, temperature-controlled, stream line flame is produced by the slow, retarded, prolonged combustion of the fuel. It is brought about by the slow, unagitated, nonturbulent, stream line flow of the fuel, and air admitted therewith, through the combustion space. It exists when the oxygen exhausted gas surrounding each particle of burning fuel is not replaced instantly and constantly by a fresh supply of oxygen.

Its primary advantage lies in the fact that it does not produce a localized zone of extreme temperature, destructive of the brick work of the furnace and productive of the formation of slag. The secondary advantage is that, when that flame is employed, currents of outside air can be induced into the furnace to flow between the walls and the flame, thereby giving direct protection to the walls by insulation and indirect protection by cooling that part of the flame nearest the walls. Moreover, in the long-flame process the cooling current of air finds its way also between the flame and the bottom of the furnace and there serves to cool, below its fusing point; the temperature of the refuse passing from the flame to the bottom of the furnace, thus making the refuse easily and readily removable.

The furnace of the original application is of the type having a combustion chamber and a mixing oven projecting in front. Fuel and air, entering the oven at relatively high velocity through a burner positioned more or less vertically in its top wall, impinge upon a target wall at the bottom. Auxiliary air enters through pipes in its front wall. A furnace easily repaired during operation and an improved method of feeding and mixing with air were the broad objects of the patent sought. The application stated:

"Heretofore those parts of the furnace which deteriorated rapidly were inaccessible during the operation of the furnace, and it was therefore not possible to repair or renew the same without putting the furnace out of use. It is proposed in the present invention to enable the renewal of these parts while the furnace is in use. * * *" Page 1, lines 26–33.

To this end a door was provided above the floor of the oven or target wall. Page 1, lines 76–81. The application further stated:

"The target wall, because of its intense

heat and the impingement of the fuel thereon, very rapidly deteriorates, the bricks becoming melted, burnt out, and otherwise affected, so that renewal becomes necessary. Heretofore renewal or repair of such parts necessitated the putting out of operation and complete cooling of the furnace. According to the present invention, we propose to permit the renewal of the target wall surface during operation of the furnace. To this end, the target wall is disposed laterally adjacent the front wall of the mixing oven, or other point at which accessibility may be possible, and by opening the door *17* bricks may be inserted and placed upon the target wall by a suitable tool, or the same may be thrown therein, thereby providing a new surface. Slag and the melted and burnt-out refractory material forming the target wall flow into the base *20* and may be removed through the door *21.* By enabling this renewal of the target wall surface at frequent intervals, the furnace may be maintained at its maximum efficiency at all times, without necessitating any loss of time or heating effect." Page 2, lines 71–97.

An "improved feeding means" (the burner), an upwardly inclined guide wall opposed to the target wall, a slag reservoir common to and intermediate the target wall and the inclined wall, were also specified. The burner consists of a fuel pipe, containing a small steam or air nozzle pipe, surrounded by a number of air channels controlled by dampers. The inclined wall is an element of some evidential value in determining the principle of the furnace and the process of combustion to be employed therein; but it may be best considered in connection with the process. With the slag reservoir we are not particularly concerned. Nowhere did the original application specify dimensions of parts or directions as to relative sizes, save by the implication that they should be such as would carry out the described process.

In the process of burning the fuel the original application contemplated high velocity feed, agitation of fuel and air in the furnace, rapid combustion, and impingement upon the target wall. The application stated:

"It is proposed in the present invention to * * * greatly improve the process of combustion. A further object is to provide an improved feeding means, whereby a more perfect mixture of the fuel and combustion air is afforded, permitting rapid combustion to take place, and to this end we propose in one embodiment of our invention to feed the fuel in separate streams independently embraced by air." Page 1, lines 31–42.

Again:

"In operation, the pulverized fuel enters through the nozzle pipe *35,* fed by means of air under pressure or by induction produced by the induction jet from the nozzle *36,* causing the fuel to enter at a relatively high velocity. A combined mixture of fuel and air is forced by air pressure or induction through the fuel nozzle *36.* This stream is surrounded and mixed with additional air entering by induction through the channel *24,* which mixture of fuel and air is again surrounded and mixed with additional air entering by induction through the channels *26, 27, 28.* The fuel, being now mixed with sufficient air for combustion and subjected to the radiant heat from the incandescent target wall *16,* burns. The process of combustion is assisted by the air entering the air openings *14,* which tends to break up the surrounding layer of consumed gas by causing eddies, and permitting additional air to come into intimate contact with the partially consumed gas in the core of the flame causing complete combustion. The mixture impinges against the target wall *16,* and by reason of the inclination of the said wall is deflected in the direction of the arrows toward the inclined rear wall *19,* which guides the same upwardly through the furnace. The target wall is incandescent during operation of the furnace, and causes ignition of the fuel. In order to promote the production of a perfect mixture of the fuel and air, and to prevent the impinging of the fuel upon the target wall in spots, air is admitted transversely of the incoming streams from the burners through the pipes *14;* the effect of this being to thoroughly mix the fuel and air and to exert a change in the course of the fuel to the extent that it impinges upon the entire surface of the incandescent target wall." Page 2, lines 18–60.

As I read these disclosures, they not only point with meticulous care the way to the short, hot flame, but with equal certainty they bar the road to the long, soft flame. The parting of the ways and the direction to be taken are definitely marked by the stated object itself: "Whereby a more perfect mixture of the fuel and combustion air is afforded, permitting rapid combustion." Page 1, lines 34–36. Nor is the means of bringing about that "more perfect mixture" left to conjecture. The fuel, entering "at a relatively high velocity," is mixed and surrounded "with sufficient air for combustion." Page 2, line 32. But, unless the oxygen-exhausted gases surrounding the particles of burning fuel are quickly dissipated and replaced by oxygen-bearing air, the combustion

will not be "rapid." Hence air entering through the pipes in the front wall, and moving transversely to the fuel flow, is provided "to break up the surrounding layer of consumed gas, * * * causing complete combustion." Page 2, lines 36–42.

That the force or pressure behind the air entering through the pipes in the front wall was to be adequate for that purpose is not left in doubt. The air from the pipes was to reach "the core of the flame," notwithstanding the fuel was caused to enter the mixing oven at a velocity sufficiently high to cause it to impinge upon the target wall, be deflected against the inclined wall, and be guided by that second contact upwardly through the furnace. It was to have momentum sufficient, not only "to thoroughly mix the fuel and air," but also "to exert a change in the course of the fuel." Page 2, lines 56–58. The defendant, to show that the long flame is indicated or suggested by the original disclosure, points to original claims 11 and 12, the first of which was:

"In the art of burning fuel, that step which consists in feeding mixed fuel and air, and subjecting said mixed fuel and air to embracing columns of air."

Claim 12 differed from claim 11 only in that it applied to a plurality of columns of mixed fuel and air. In the "embracing columns of air" of these claims the long flame cannot exist. The columns of air there referred to embrace only the entering "fuel and air," and are immediately destroyed and thoroughly mixed with the fuel and other air (page 2, line 56) by the force of the air entering through the front pipes, while the air essential to the existence of the long flame must embrace, not the entering mixture of fuel and air alone, but the length of the flame, and remain in large measure unmixed.

The original application, as I view it, discloses a process of burning pulverized coal by the hard, short flame only, and a furnace functioning or having a principle of operation suitable to carry out that process. Moreover, it says nothing which to my mind indicates, suggests, or discloses the long-flame process or furnace.

[1] On April 27, 1921, while the original application stood unamended by the addition of the matter now appearing at line 98, page 2, to line 13, page 3, the so-called divisional application was filed. That application, as I understand it, not only points with meticulous care the way to the long, temperature-controlled flame, but with equal certainty bars the road to the hot, short flame. Instead of teaching that the fuel should be injected forcibly into the mixing oven at relatively high velocity, it teaches that it should be introduced "more or less gently." Page 1, lines 53–91; page 2, line 72. Instead of the forcible impingement of the fuel upon the walls, causing the walls quickly to melt, run, and be destroyed, it forbids impingement and describes a furnace with walls of long life. Page 2, line 88. Instead of igniting the fuel by "the radiant heat from the incandescent target wall" (page 2, lines 31–34), this is brought about by the heat from the ascending portion of the flame stream. In place of the violently agitated mixture of fuel and air of the original application, it "contemplates the introduction of the fuel, or a mixture of the fuel and air, and the admission of a supporter of combustion, such as air, in such manner as not to destroy stream line combustion" (page 1, lines 31–35).

It has for one of its objects "to admit and burn (italics mine) the fuel in the presence of an embracing or surrounding envelope of columns of air" (page 1, lines 36–39), which, in the absence of the forbidden agitation, "will naturally follow the stream line of the burning fuel" (page 1, lines 88–95), and provide, not only protection to the walls (page 2, line 126), but "a neutral or cooling zone * * * through which the precipitating ash is cooled below slag-forming temperature, and the deposit on the floor of the furnace is in a more or less flocculent condition, which permits of its ready removal" (page 2, lines 92–99). In opposition to the rapid combustion of the original application is placed retarded combustion. Page 3, line 23. In striking contrast to the short, hot flame, having a localized zone of extreme temperature destructive of the brickwork, and productive of the formation of slag by virtue of its relatively higher radiation, is the long, soft flame, nowhere of excessively high temperature. Page 3, lines 3–10.

All the claims are built around the long, stream line, temperature-controlled flame, and, in my opinion, are the embodiment of an idea wholly foreign to the disclosures of the original application. It follows that the effective date of the process patent in suit is that upon which its application was filed, and not that of the filing of the original application.

The original application was amended December 11, 1922, a year and a half after the filing of the application for the separate process patent, and almost five years after the date of the original application. This amendment for the first time tacked onto the original disclosures the new ideas of the sep-

arate process patent. As against the teaching of the first column of the second page of the apparatus patent, that the air entering through the pipes in the front wall of the mixing oven should be forcibly injected, the second column of that page, which now embodies the amendment in part, instructs that through those pipes the air is "induced." Against the thorough mixing of the fuel and air of the first column, the second now sets up a delayed admixture. Lines 119, 120. Against the teaching of the first column that the transversely injected air should enter the core of the flame, the second tells us that it follows "a stream line course or path," paralleling "the general stream line course of the fuel and flame stream with some air at the lower region thereof, until the temperature is sufficiently raised for complete commingling."

Set off in striking contrast to the impingement of the fuel on the target wall, its deflection toward the rear wall, and its there being guided upwardly, all by the velocity of the injection of the fuel into the mixing oven, is the conclusion of the amendment, which reveals that "the admission of air through the pipes *14* [obviously by induction as theretofore set out in the amendment] protects the front wall and makes it possible to shift the admission means or burner near such wall, *which* in turn *makes possible* the U-shaped course of the fuel and flame stream in the chamber" (italics mine). Page 3, lines 7–13.

[2] Thus by amendment the defendant would change, not only the originally disclosed process of burning pulverized fuel, but, as well, the principle of the furnace in which that process was to be employed, and cause it to function in a different way to produce a different result. Such amendments are invalid. Robinson on Patents, §§ 561, 635. See Heller Bros. Co. v. Crucible Steel Co. (C. C. A.) 297 F. 39.

I am at a loss to understand how a patent, whose teachings and instructions are so generally and sharply conflicting, both as to the steps of the process and the principle of the machine or apparatus, can be held to meet the requirements of R. S. § 4888 (Comp. St. § 9432), which demands as a prerequisite to the granting of a valid patent a description of the invention "in such full, clear, concise, and exact terms as to enable any person skilled in the art or science to which it appertains, or with which it is most nearly connected, to make, construct, compound, and use the same; and in case of a machine, he shall explain the principle

thereof. * * *" Yet a finding of invalidity of the claims of the apparatus patent need not be based upon that ground, for each of the claims embodies an element found only in the new matter of the amendment. For instance, in claim 2, designated by the defendant as one typifying all the claims of the patent, it is required, among other things, that "the coal admission means being located to one side of the outlet, so that the fuel and flame stream describes a U-shaped course through the chamber to the outlet under the action of the draft, said chamber being provided with means through which a flow of air is induced thereinto by the draft near the entering fuel whereby the entering fuel particles flow past a slower moving bordering body of air."

The reason for the appearance of the new matter set out in the amendment to the original application and in the application for the process patent is found in the failure of a furnace built and operated early in 1918, in conformity with the principle and process of the original disclosure, by the defendant at the Oneida Street station of the United Electric Light & Power Company at Milwaukee, and in the subsequent alteration of that furnace so as to embody the principle of the present claims of the apparatus patent, and to operate in accordance with the steps of the present claims of the process patent. When so altered and operated, it was a success.

[3] Though the facts and ideas developed at Milwaukee urgently demanded that the patent disclosures be made to conform to, the new discovery, and constituted the reason for the ultimate appearance of the new matter in the patent proceedings, yet, either through a failure to recognize the demand or a failure to act thereon, nothing was done until the filing on April 27, 1921, of the application for the process patent. This disclosed and claimed the process found successful at Milwaukee, and there put into public use as early as August, 1918. As that process was not suggested by the original disclosure, the process patent has for its effective date that upon which its application was filed. As that date was more than two years after the successful public use of the process in Milwaukee, all of the claims of the process patent are invalid.

[4] It is true that the furnace manufactured by the defendant, embodying the principle of the apparatus claims and employing the process of the method claims, has gone into wide and successful public use. Though usually such fact might be pertinent to the validity

of the claims, yet here it cannot avail the defendant, for the widely used furnace and process are not those of the original disclosure. Moreover, all the claims of both patents must fail, I think, by reason of a prior public use of the claimed furnace and process at the Henry Phipps plant in Pittsburgh. The furnace and process as there first employed were described in the issue of "Power" of February 14, 1911. The testimony discloses that changes in the furnace and the process were subsequently made. The record, as I see it, makes clear, however, that in 1912, at least, they were beyond the experimental stage (Buser v. Novelty Tufting Machine Co., 151 F. 478, 81 C. C. A. 16), and that they then constituted complete anticipations of all the claims in suit.

[5] Unquestionably, defendant's furnace is much larger; but a mere increase in size does not involve patentable novelty. A complete analysis of the evidence touching the prior use at the Phipps plant would, I think, serve no useful purpose, for, in my opinion, the matters hereinbefore considered at length are determinative of the decree here to be entered.

The counterclaim must be dismissed.