BALL et al. v. COKER et al.

(Circuit Court of Appeals, Fourth Circuit.   November 4, 1913.)

No. 1151.

1. PATENTS (§ 27*)—PATENTABILITY—"PROCESS."
   A "process," within the meaning of the patent law, is a useful art, and a process may be patentable, although a mechanism is necessary in carrying it out, and the mechanism may or may not be new or patentable; but a valid patent cannot be obtained for a process which involves nothing more than the operation of a piece of mechanism, or, in other words, the function of a machine.

   [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 31, 32;  Dec. Dig. § 27.*

   For other definitions, see Words and Phrases, vol. 6, pp. 5642–5651; vol. 8, p. 7766.]

2. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—PROCESS OF HULLING COTTON SEED.
   The Ball patent, No. 807,990, for a process of hulling cotton seed of various sizes without substantial disintegration of the meats, consisting essentially in passing the seed through a graduated series of hull cutting devices set successively closer together, is void for lack of invention as involving no more than the operation of well-known hulling machines acting independently but successively each more closely adjusted than the one before and acting only on the seed left unhulled by it.   Also, *held* not infringed.

3. PATENTS (§§ 25, 26*)—SUBJECTS OF PATENTS—"COMBINATION"—"AGGREGATION."
   The distinction between a "combination" and an "aggregation" lies in the presence or absence of mutuality of action; a "combination" essentially requiring that there be some joint operation performed by its elements, producing a result due to their joint and co-operating action, while in an "aggregation" there is a mere adding together of separate contributions, each operating independently of the other.

   [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 27–30; Dec. Dig. §§ 25, 26.*

   For other definitions, see Words and Phrases, vol. 2, pp. 1275, 1277; vol. 1, p. 271.]

Appeal from the District Court of the United States for the Eastern District of South Carolina, at Charleston; Henry A. Middleton Smith, Judge.

Suit in equity by W. T. Ball, Francis I. Legare, and T. Allen Legare, administrators of George S. Legare, deceased, and Hampton K. Lea, Charles Miner, and Thomas H. Tatum, against J. L. Coker, J. J. Lawton, and D. R. Coker, doing business under the firm name of Hartsville Oil Mill.   Decree for defendants, and complainants appeal.   Affirmed.

George E. Tew, of Washington, D. C., and Thomas H. Tatum, of Bishopville, S. C., for appellants.

John M. Coit, of Washington, D. C., and W. C. Miller, of Charleston, S. C., for appellees.

Before PRITCHARD, Circuit Judge, and KELLER and CONNOR, District Judges.

CONNOR, District Judge. The patent, upon which plaintiff relies and for the alleged infringement of which relief is demanded, was issued to W. T. Ball, upon application filed June 17, 1903, issued June 19, 1905, and numbered 807,990. The learned judge below, in his decree, sets out clearly a description of plaintiff's claim. He says:

"The patent is for a process in milling cotton seed. It appears from the testimony that, at the date of the application for this patent, the state of the art, method, or operation of milling cotton seed was that cotton seed was then milled or hulled by the cotton seed oil and meal manufacturers, or crushers, by running the cotton seed between hull-cutting cylinders or disks, or other hulling devices. The cotton seed, as it came from the cotton ginneries to the cotton seed oil and meal mills, was first subjected to the process of cleaning it of what are known as linters, that is to say, by denuding the cotton seed, as far as possible, from all lint or cotton growth still adhering, after the ordinary gin had stripped it of the cotton sold, as cotton, commercially. After the cotton seed mill operator had denuded it of these linters, the seed was passed through machines devised for the purpose of cutting off, or removing, the hull from the interior of the seed known as the kernel or meat; these hullers through which the seed was passed consisted of machines composed of cylinders or disks, with teeth, knives, or cutting edges or surfaces, whereby, as the seed passed between them, the hulls were removed. Cotton seed is of different sizes. The knives or cutting surfaces, however, between these cylinders or disks, were generally set at fixed distances and, therefore, as the seed passed through, all seed that was too large would have a larger portion of the meat cut off and left adhering to the hull when the hull was removed, or would be more or less crushed in passing between the knives or cutting surfaces, and seed that was small enough to pass, without being cut, would pass through unhulled. The extent of the seed that would pass through uncut, according to the testimony, varies, and presumably, necessarily varied according to the variation in the size of the seed; * * * but it may be assumed that quite a considerable percentage of the cotton seed passing through these hullers was cut or broken, so as to leave a good deal of the seed adhering to the hulls in the case of large seed and that quite a percentage of small seed passed through unhulled. Due to these conditions, there was a considerable loss in the outcome of the seed, after passing through the hullers, estimated, in some of the testimony, as high as six to ten per cent. Ball's application for a patent for an improvement in the method of milling cotton seed designed to obviate this loss or reduce it to a minimum. The improvement claimed by Ball consisted in passing the seed successively through different sets of rollers, or cylinders with teeth set at different distances, viz., the seed would be passed through the first pair of hulling rollers or cylinders, which were set at a distance, so as to hull only the larger seed, and pass through the smaller seed unhulled. When this was done, the mass would go to a separator which would separate the mass into uncut seed, hulls, and meat, and then the uncut seed would be delivered to a second pair of rollers or plates in which the knives or cutting surfaces were set closer together, when the operation would be repeated, and then a second separation would take place and finally the remaining uncut seed would be delivered to a third set of rollers set still closer together by which the still smaller seed would be hulled. According to the plan of this device, the number or sets of rollers or cylinders which could be used were indefinite. * * * The successive sets, enumerated in the patent and recommended by the patentees, as calculated to effect the best results are three different pairs of rollers or cylinders, upon the assumption that the seed would practically grade into these different sizes. The result of passing it in this way is, under the claim of the patentee, to prevent loss by, in the first place, preventing the breaking of the large seed and preventing too large a proportion of the kernels or meat adhering to the hulls, and also of prevent-

ing anything but·a very small percentage of the small seed passing through unhulled."

The claims allowed by the patent are for a process of hulling cotton seed of various sizes. ·

"1. Without disintegrating the meats; consisting essentially in passing the seed through a graduated series of pairs of hull-cutting rollers set successively closer together, and cutting and removing the hulls of seeds of successively smaller size without disintegrating the meats.

"2. Without disintegrating the meats by extracting the whole meats from the hulls of successively smaller sizes of the seed at several successive cuts.

"3. By passing the seed through a succession of hulling devices of gradually decreasing clearance, set to remove the hulls and extracting the meats sub-· stantially without disintegration thereof.

"4. Without substantial disintegration of the meats, consisting essentially in passing the seed through a graduated series of hull-cutting devices set successively closer together."

The District Judge proceeds to say:

"A closer comparison of the patent as claimed by the complainant with the existing art at the time shows that the art of hulling cotton seed by passing it through hullers, whether cylindrical or disk, with teeth or knives or cutting surfaces set at graduated distances, was well known and practiced, and the patentee neither claims, nor can claim, any patent thereon. The real basis of his claim is for a process identically the same in character with the process in vogue at the time, but consisting only of passing the seed more than once through the hullers. That is, of going over the same process in succession, the process being identical, the only difference being that each machine in this successive operation has the teeth or cutting knives ,or surfaces set closer together. He does not, in any wise, claim any patent upon the process of having these knives or teeth set closer together or wider apart. Anybody who chooses to practice the old process with a single pair of hullers could set the teeth, knives, or surfaces at any distance apart he saw fit. The distance at which these teeth or knives would be set would depend upon the judgment or skill or caprice of the operator. Ball's patent depends only upon the fact that the seed, instead of being subjected to the operation of passing through the hullers once, is passed through the hullers two or more times, and it is only upon the passing it more than once and successively through·a machine, that is unpatentable in itself, that a patent is claimed in this case. The patent claimed is not on the machine, but on the method of repeating the operation."

The learned judge, in discussing the questions·presented upon the pleadings and the evidence, inquired, first, whether the process claimed by plaintiff Ball, as covered by his patent, was patentable, within the language and meaning of the statute. After a careful examination of the question, he reached the conclusion that:

"The passing of the seed through the machine a number of times instead of once, and thereby·procuring better results, may mean more careful and skillful workmanship and operation, but does not involve that organization of a new device, or of such inventive skill, as would authorize a patent. The results are the product of mere mechanical skill and not of invention."

This conclusion constitutes plaintiff's first assignment of error.

The judge recognized and reached his conclusion, with due regard to the elementary rule that:

"Letters patent are prima facie evidence of invention, unless sufficient evidence appears to overcome the presumption." Mitchell v. Tilghman, 19 Wall. (86 U. S.) 287, 22 L. Ed; 125; Parks v. Booth, 102 U. S. 96, 26 L. Ed. 54, and many other decisions cited in plaintiff's brief.

[1] The assignment of error will be considered by this court, with this well-settled truth in mind. The fact must be kept in view that the patentee does not claim to have invented any new device or instrumentality. This, however, is not determinative of the validity of the patent. A "process," within the terms and meaning of the Constitution and statute, "is a useful art." It is defined to be:

"A mode of treatment of certain materials to produce a given result. It is an act, or series of acts, performed upon the subject-matter to be transformed and reduced to a different state or thing. If new and useful it is just as patentable as a piece of machinery. In the language of the patent law, it is an art. The machinery pointed out as suitable to perform the process may, or may not, be new or patentable; whilst the process itself may be altogether new and produce an entirely new result. The process requires that certain things should be done with certain substances and in a certain order; but the tools to be used in doing this may be of secondary consequence." Cochrane v. Deener, 94 U. S. 780, 24 L. Ed. 139.

The process, in that case, was useful for increasing the production of the best quality of flour by separating from the meal, first the superfine flour and then the pulverulent impurities mingled with the flour producing portions of the middlings so as to make "white" or "purified" middlings which, when reground and bolted, would yield pure white flour which, when added to the superfine, would improve the quality of the flour resulting, from their union, instead of deteriorating its quality, as had theretofore been the case. The patent was held to be valid. In Tilghman v. Proctor, 102 U. S. 728, 26 L. Ed. 279, it is said:

"The mixing of certain substances together, or the heating of a substance to a certain temperament, is a process."

This is illustrated in Carnegie Steel Co. v. Cambria Iron Co., 185 U. S. 403, 22 Sup. Ct. 698, 46 L. Ed. 968. In Risdon Locomotive Co. v. Medart, 158 U. S. 68, 15 Sup. Ct. 745, 39 L. Ed. 899, Mr. Justice Brown says:

"It may be said, in general, that processes of manufacture which involve chemical or other similar elemental action are patentable, though mechanism may be necessary in the application or carrying out of such process, while those which consist solely in the operation of a machine are not."

The learned justice says:

"It is equally clear, however, that a valid patent cannot be obtained for a process which involves nothing more than the operation of a piece of mechanism or, in other words, for the function of a machine."

In Corning v. Burden, 15 How. 252, 14 L. Ed. 683, Mr. Justice Grier says:

"A process, eo nomine, is not made the subject of a patent in our act of Congress. It is included under the general term 'useful art.' An art may require one or more processes or machines, in order to produce a certain result or manufacture. The term 'machine' includes every mechanical device or combination of mechanical powers and devices to perform some function and produce a certain effect or result. But where the result or effect is produced by chemical action, by the operation or application of some element or power of nature, or of one substance to another, such modes, methods, or operations are called 'processes.' A new process is usually the result of discovery; a machine of invention. The arts of tanning, dyeing, making waterproof cloth,

vulcanizing India rubber, smelting ores, and numerous others, are usually carried on by processes as distinguished from machines. * * * It is for the discovery or invention of some practical method or means of producing a beneficial result or effect that a patent is granted, and not for the result or effect itself. It is when the term 'process' is used to represent the means or method of producing a result that it is patentable, and it will include all methods or means which are not effected by mechanism or mechanical combinations. * * * But it is well settled that a man cannot have a patent for the function or abstract effect of a machine, but only for the machine which produces it."

[3] The distinction between a "combination" and an "aggregation" lies in the presence or absence of mutuality of action.

"To constitute a 'combination' it is essential that there should be some joint operation performed by its elements, producing a result due to their joint and co-operating action, while in an 'aggregation' there is a mere adding together of separate contributions, each operating independently of the other. * * * Defendant's machine comprises merely an aggregation of two devices. There is no mechanical or functional mutuality of operation. It is not a combination because there is no co-operation between the coating and jarring mechanisms, because the two devices do not unitedly perform their function, and because they are not necessarily combined in one machine, and do not act together to secure the final result. * * · * But there is absolutely no union or mutuality of operation, no conjoint or qualifying co-operation of the parts. Each device is individually independent in the sense that each performs its peculiar function without affecting or being affected by the action of the other device." Chocolate Machinery Co. v. Helmstetter, 142 Fed. 980, 74 C. C. A. 240.

It is said in Osgood Co. v. Metropolitan Dredging Co., 75 Fed. 670, 21 C. C. A. 491, that:

"It is a commonly accepted rule in the law of patents that the inventive idea is not ordinarily present in the conception of a combination which merely brings together two or more functions, to be availed of independently of each other. The mechanism which accomplishes such a result is ordinarily spoken of as a mere aggregation."

So, in Richards v. Chase, 158 U. S. 299, 15 Sup. Ct. 831, 39 L. Ed. 991, it is said:

"Unless the combination accomplishes some new result, the mere multiplicity of elements does not make it patentable. So long as each element performs some old and well-known function, the result is not a patentable combination, but an aggregation of elements. Indeed, the multiplicity of elements may go on indefinitely without creating a patentable combination, unless by their collocation a new result was produced." ·

In Hailes v. Van Wormer, 20 Wall. 353, 368, 22 L. Ed. 241, Mr. Justice Strong says:

"It must be conceded that a new combination, if it produces new and useful results, is patentable, though all the constituents of the combination were well known and in common use before the combination was made. But the results must be a product of the combination, and not a mere aggregation of several results each the complete product of one of the combined elements. Combined results are not necessarily a novel result, nor are they an old result obtained in a new and improved manner. Merely bringing old devices into juxtaposition and then allowing each to work out its own effect without the production of something novel, is not invention."

This language is quoted, with approval, by Mr. Justice Matthews in Pickering v. McCullough, 104 U. S. 310, 317, 26 L. Ed. 749. Applying the principle to the case then under consideration, he says:

"In Niblo's apparatus, it is perfectly clear that all the elements of the combination are old, and that each operates only in the old way. Beyond the separate and well-known results produced by them severally, no one of them contributes to the combined result any new feature; no one of them adds to the combination anything more than its separate, independent effect; no one of them gives any additional efficiency to the others or changes in any way the mode or result of its action."

To be patentable the combination of all elements or devices must "form, either a new machine of a distinct character and function, or produce a result due to the joint and co-operating action of all the elements, and which is not the mere adding together of separate contributions. Otherwise it is only a mechanical juxtaposition and not a vital union."

[2] In the light of these, and many other, more or less, analogous decided cases, we concur in the conclusion reached by the court below. As said by the counsel for appellee:

"Neither huller acts on any seed acted on by the other huller, but, on the contrary, acts on different seed. Each huller has its own function and produces its own result; the hulled seed or kernel coming from one machine being separate and distinct from those coming from the other machine and being in no way changed in character or condition by the other machine. The product of each machine is collected separately, and it is clear therefore that there is no new combined result, but a mere addition of separate and independent results."

It would be a strange construction of the patent laws if one could obtain a monopoly by means of a patent in the mere manner of using three or more hullers by changing the position of the knives, and thereby securing the result for which the huller is designed—the separation of the hull from the meat without disintegrating the meat.

We can add nothing of value to the manner in which the learned judge below has stated his conclusion, in which we concur.

The court was also of the opinion that, conceding the patentability of the process claimed to have been discovered by Ball, the evidence did not show any infringement by defendants. He thus describes the manner of defendants' treatment of seed:

"The evidence produced by the plaintiffs shows that the seed was first passed by defendants through a huller with the knives set at a fixed opening or clearance. After passing through this, the unhulled seed was passed through a second huller formed of a pair of discs claimed by the defendants to be in reality a grinder, in which the surfaces of the hulling or grinding discs were kept closer together than the distance between the cutting knives or teeth in the first huller. This was accomplished by the use of a thumb or set screw, which could be operated to reduce or enlarge the clearance between the discs, according as it was set. One of these discs was stationary, and the other revolved. The pulleys driving the shaft of the revolving discs were so aligned that the tendency was to draw the revolving discs up against the stationary one and thus separate the surfaces only by the size of the seed. The second huller, however, did not have the effect of delivering the seed whole or not disintegrated; but, on the contrary, a large proportion of the seed that passed through the second huller, under the process used by the defendants, was badly cut and the meats or kernels of the seed more or less crushed or ground. As a conclusion of fact it would appear that the process followed by the defendant was entirely different from that embraced in the patent and produced very different results than that claimed to be the result to be produced by the patentee's process. The device used by the defendants

was not of passing the seed through successive hullers, with the cutting surfaces set at fixed clearances, but of passing through first one huller and then another, with the cutting surfaces of the last set at a variable clearance, according to the set of the thumb screw or the pressure produced by the pulley alignment at the time. Next, the hulled seed was not delivered substantially without disintegration by the second huller, but, on the contrary, was delivered with a very large percentage of disintegration."

It appears that the purpose or object which Ball had in view in his process, using these hullers with the knives so adjusted that all of the seed were hulled and the meat without disintegration, became available, free from hulls—he was of the opinion that the use of three hullers was, for practical purposes, taking into consideration the graduated size of the seed, sufficient to produce satisfactory results. The meal was, from this view point, to be practically free from hulls. Defendants, on the other hand, conceived that, after passing the seed through one huller, those passing into the second huller should be ground with the hulls and, in that condition, after extraction of the oil, be used as meal. As said by the judge, the purpose or object in view by defendants was not only different but contrary to that of plaintiff. Defendant Lawton explains this very clearly. He says:

"We wanted to do two or three things with that huller. We wanted to cut these seeds which had escaped the first huller. So in order to do that we ran the machine very fine. That is one thing we wanted to do. Then, in addition to that, we wanted to grind up our hulls very fine because we wanted to put these hulls in our meats, because we found that, by admixing a good proportion of the hulls to the meats we can get very much more oil out of the seed. That was another thing we wanted to do. And then, another thing we wanted to do was to put the hulls into our meal, to regulate our ammonia contents. * * * There were several objects in view. One was that we wanted to recover any seed that might escape the first huller. But the most important thing, I would say, in all, was that we wanted to get a lot of fine ground hull into our meats, because we found that we could get very much more oil by doing that. * * * When you put a quantity of ground hulls in with the meats, it makes the meats very much more porous, and you get better results by mixing the hulls with the meat, and the result is that the mills by putting in more meats with the hulls can get two or three tons more for their seed. That was one reason. And then another reason is that we can regulate the ammonia contents of the meal, by putting in more of the hulls, which acts as a filler on the meal, and we can comply better with our state law by putting in a good quantity of hull."

Samples of the results of defendants' method of treatment were in evidence before the district judge. The principle comment made upon the conclusion reached, upon this branch of the case, was that the judge had not reached a correct conclusion of fact. In this we do not concur. It seems to us manifest, from the excerpts from the evidence given and much other of the same character, that the conclusion of the learned judge is correct. To permit a patent for a process, based upon claims so intangible and elusive as the one upon which plaintiffs rely, to be given so comprehensive, inclusive operation as insisted upon here, would not only do violence to the policy upon which our patent laws are based, but unreasonably and unduly restrict industrial liberty. It would be difficult to fix the boundary within which, in the mechanical, manufacturing, domestic, and agricultural activities, people might safely act.

Upon a careful examination of the record and the briefs filed, we are of the opinion that, in both aspects of the case, the learned district judge reached a correct conclusion

The decree is affirmed.