NATIONAL MACH. CORP., Inc., v. BENTHALL MACH. CO., Inc.*

(Circuit Court of Appeals, Fourth Circuit. November 23, 1916.)

No. 1439.

1. PATENTS ⊕⊃328—INVENTION—PEANUT STEMMING SAW.
    The Benthall patent, No. 890,401, for a peanut stemming saw consisting of a disk with teeth on its periphery, and the essential features of which are that the teeth have a straight front edge, the heels of the teeth are farther from the center of the disk than the points thereof, and the edges of the adjacent teeth meet at an acute angle, is void for lack of invention in view of the prior and analogous arts; also *held* not infringed.

2. PATENTS ⊕⊃112(1)—VALIDITY—EFFECT OF DECISION OF PATENT OFFICE.
    The decision of the Patent Office in the allowance and issue of a patent creates a presumptive right only, and upon all the questions involved the validity of the patent is subject to examination by the courts.
    [Ed. Note.—For other cases, see Patents, Cent. Dig. § 162.]

3. PATENTS ⊕⊃26(2)—INVENTION—COMBINATION OF OLD ELEMENTS.
    While a new combination of old things may be patentable, it is only where the combination is new and the combined elements co-operate to produce a new result; otherwise their joinder is a mere aggregation, and not patentable.
    [Ed. Note.—For other cases, see Patents, Cent. Dig. § 29.]

4. PATENTS ⊕⊃58—ANTICIPATION—EVIDENCE TO CARRY BACK DATE OF INVENTION.
    Where the date of use of an alleged anticipating device is shown beyond doubt, the burden rests on a subsequent patentee to carry his invention back to an earlier date, and for that purpose oral testimony alone is not sufficient.
    [Ed. Note.—For other cases, see Patents, Cent. Dig. § 75.]

5. PATENTS ⊕⊃54—ANTICIPATION—ABANDONED EXPERIMENT.
    An alleged anticipating device which has been in continuous practical use for a number of years and is still being used without any change in the principle of its operation, although there may have been changes made in minor parts of the machine, cannot be considered an abandoned experiment.
    [Ed. Note.—For other cases, see Patents, Cent. Dig. § 73.]

6. PATENTS ⊕⊃312(3)—INFRINGEMENT—EVIDENCE TO ESTABLISH.
    Infringement, which is a tort, cannot be established by evidence which is speculative in its character, and this is especially true where a witness who attempts to testify as an expert does not possess the qualifications of an expert.
    [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 548, 549.]

7. PATENTS ⊕⊃165—SCOPE—DESCRIPTION OF INVENTION.
    One who seeks a patent must necessarily do so with the understanding that he is dealing with the public at large, and for that reason he is required to clearly define the scope of his invention, and he is bound by the limitations so imposed.
    [Ed. Note.—For other cases, see Patents, Cent. Dig. § 241.]

8. PATENTS ⊕⊃30(1)—INVENTION—COMMERCIAL SUCCESS AS EVIDENCE.
    The extent to which a patented article has gone into use is an unsafe criterion of invention, and commercial success alone will not establish invention.
    [Ed. Note.—For other cases, see Patents, Cent. Dig. § 34.]

⊕⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Rehearing denied February 28, 1917.

9. PATENTS ⊕⊃328—ANTICIPATION—PEANUT STEMMING MACHINE.
    The Jones patent, No. 908,271, for a peanut stemming machine, is void
    for anticipation.

Cross-Appeals from the District Court of the United States for the Eastern District of Virginia, at Norfolk; Edmund Waddill, Jr., Judge.

Suit in equity by the Benthall Machine Company, Incorporated, against the National Machine Corporation, Incorporated. From the decree, both parties appeal. Affirmed on complainant's appeal, and reversed on defendant's appeal.

For opinion below, see 222 Fed. 918.

George W. Ramsey, of New York City, and Melville Church, of Washington, D. C. (Menalcus Lankford, of Norfolk, Va., on the brief), for appellant and cross-appellee.

T. Hart Anderson, of New York City (Munn & Munn, of New York City, and Tazewell Taylor, of Norfolk, Va., on the brief), for appellee and cross-appellant.

Before PRITCHARD, KNAPP, and WOODS, Circuit Judges.

PRITCHARD, Circuit Judge. The appellee and cross-appellant will be referred to as complainant, and the appellant and cross-appellee as defendant, such being the respective positions occupied by the parties in the court below.

Suit was brought by the complainant, a corporation doing business in the city of Suffolk, Va., against the National Machine Corporation, organized under the laws of the state of Virginia, and doing business in the city of Suffolk, Va., alleging an infringement of the patent to Benthall, No. 890,401, on a peanut stemming saw, and a patent to Jones, No. 908,271, on a peanut stemmer. The court below dismissed the bill as to the Jones patent and sustained the Benthall patent on the saw and granted an injunction against the defendant. The National Machine Corporation took an appeal from the injunction, and the Benthall Machine Company filed a cross-appeal from the decree of the court below dismissing the bill as to the Jones patent. The subject-matter of the Benthall patent is different from that of the Jones patent. Therefore each will be treated in its turn in the course of this opinion.

[1] Defendant insists that the court below erred in holding that the letters patent No. 890,401, to Jesse T. Benthall, is, in respect to claims 4 and 5, good and valid. Complainant insists that defendant has infringed its patent by the use of a saw for stemming peanuts. The saw in question is described in the Benthall patent, page 1, line 60, as follows:

"It will be noticed from inspection of Fig. 3 that the sides of the throat meet each other at an acute angle, and that the front edge of each tooth is straight, and that the widest part of the throat is approximately the width of the tooth. By this construction the stems when engaged by the throat are drawn to the bottom thereof, and the gradual narrowing of the stem exerts a wedging action on the stem, thus gripping the same sufficiently tight to draw it between the slats and to strip the nuts therefrom."

The claims of the Benthall patent in suit are:

"(4) In a peanut stemmer, a stemming device comprising a disk provided on its periphery with a plurality of teeth, said teeth being inclined to radii of the disks, and having their front edges straight, the edges of the adjacent teeth meeting at an acute angle, and the points of the teeth being nearer the centers of the disks than the heels thereof, and the spaces between the teeth being of a width at the widest part approximately equal to that of the teeth.

"(5) In a peanut stemmer, a stemming device comprising a disk provided on its periphery with a plurality of spaced teeth having straight front edges, the heels of the teeth being farther from the centers of the disk than the points thereof, whereby to form a guard for the point, and the edges of the adjacent teeth meeting at an acute angle, whereby to exert a wedging action on the stem."

Among other things, it appears that the limitations in the specifications and claims that the sides of the adjacent teeth meet at an acute angle were introduced by the attorney after the application was filed and the claims rejected by the Patent Office. It is insisted by defendant that the patentee is bound by this limitation, and it cites in support thereof the following cases: Burns v. Meyer, 100 U. S. 672, 25 L. Ed. 738; Keystone Bridge Co. v. Phœnix Iron Co., 95 U. S. 274, 24 L. Ed. 344; American Tobacco Co. v. Streat, 83 Fed. 700, 28 C. C. A. 18; Bonsack Machine Co. v. Smith (C. C.) 70 Fed. 383; Crown Cork & Seal Co. v. Aluminum Stopper Co. (C. C.) 100 Fed. 849; Ashton Valve Co. v. Coale Muffler & Safety Valve Co., 52 Fed. 314, 3 C. C. A. 98.

It is further insisted that, when Benthall made application for a patent (January 12, 1906), "it came into a well-developed art which begins with the patent to Eli Whitney, March 4, 1794, on the saw cotton gin; saw cotton gins were in use stemming peanuts long before Benthall, and as early as April 2, 1872, a patent was granted to Edwin Scott on a peanut 'gin';" also that, when Benthall filed his application in the Patent Office, nothing was said in either the specification or claims about any "acute angle" of the teeth to wedge the peanut stem. An examination of defendant's exhibit (the certified copy of file wrapper and claims, Benthall patent, 890,401) sustains this contention. It appears that at that time great stress was laid upon the "bills (points) of the hooks (teeth) being nearer the centers of the disks than the heels thereof." (Original claims 9 and 10.)

It further appears that saws having protected points so as to prevent scraping of the hulls or seeds were public property anterior to the time Benthall applied for his patent; patents covering these points being known as the Hazelton patents, No. 293,576 and No. 313,412, having expired in 1901 and 1902, respectively. Patent No. 293,576 was the patent for a gin saw. A description of this patent is in the following language:

"Various other modifications will readily suggest themselves to those skilled in the art, as it is manifest that the form of the tooth is immaterial so long as the heel of the tooth is higher than its point, whereby the heel or base protects or guards the point of the tooth."

Upon this description Hazelton claims this device as his patent, employing the following language in respect to the same:

"(1) A saw provided with a series of angular teeth having heels higher than their toes, as and for the purpose set forth.

"(2) A saw having a series of angular teeth, C, the points or toes, D, thereof being lower than the heels, E, and having plane breasts, A, as set forth.

"(3) A saw having angular teeth, C, provided with plane breasts, A, recesses, F, and heels, E, higher than the points or toes, D, as set forth."

Hazelton in describing the disk says:

"A is a metal disk provided with a central opening, B, by means of which it is mounted upon a shaft, C. The periphery of this disk has a series of teeth, E, of which e is the point or toe, and é the heel. The surface or face of the tooth, being that part included between the point and the heel, is a true circle from the center, B, for a distance of about two-thirds of its length, beginning at the heel and running toward the point, and the remaining portion of the face of the tooth is depressed so that the point of the tooth lies below the true periphery of the cylinder. To make this clear, the face of the tooth from the heel é to the line x is the true circumference of the disk, while the remaining portion from the line x to the point e is depressed or inclined so that the point itself is below the circumference of the disk."

The complainant no doubt appreciated the fact that he was not entitled to a patent on a saw having protected point teeth, inasmuch as it appears that he canceled these claims and changed the proposed invention to a saw with protected point teeth and acute angles between the teeth. However, the Scott patent, No. 125,338, which expired in 1889, discloses a saw with the gullet or throat having teeth meeting at an acute angle. In describing his invention Scott says:

"The nature of my invention consists in the construction and arrangement of a 'peanut thrasher and gin,' as will be hereinafter more fully set forth."

In referring to his patent gin he also says:

"From the inclined board, G, the vines and peas fall down on a gin, composed of a series of saws, I I, working between curved or inclined bars, J J, as shown in Figures 3 and 4."

On this point the defendant introduced Mr. Foster, an expert, who, among other things, stated that:

"Considering, however, now the specific utilization of toothed wheels associated with conveying or directing means for the purpose of detaching, for example, adhering vegetable fiber from seed, Eli Whitney is unquestionably the pioneer. In my opinion, he discovered what the problems were in this art and solved them."

In addition to what we have said as respects this point, the Ben Hicks patent peanut stemmer, No. 688,519, also shows and describes and claims the saw peanut stemmer. On page 1, lines 9–18, he describes his invention as follows:

"My invention is an improved machine for stemming and cleaning peanuts and green peas; and it consists in the peculiar construction and combination of devices hereinafter fully set forth and pointed out in the claims.

"The object of my invention is to provide a cheap, simple, and easily operated machine which is efficient in cleaning peanuts and green peas, stemming the same, and putting them in the best condition for the market."

On page 1, lines 95–103, he also states:

"The lower side of the trough below the slats, 25, is open. A series of stemming saws, 30, are secured on the shaft, 27, and rotated thereby, and the

upper sides of said stemming saws operate in the spaces between the slats, 25. The said stemming saws are appropriately spaced apart, and their teeth are exceedingly fine, the said saws being similar to the saws used in cotton gins. * * * "

Page 2, lines 15–41, he further states:

" * * * Owing to the fineness of the saw teeth and the lightness. in weight of the peanuts and pea, pods, the peanuts and pea pods are not cut through or in any wise injured by the saws, and the latter are effective only for the purpose of stemming pea pods and peanuts and in feeding the same from the stemming trough, as hereinbefore described."

It is insisted that the Benthall patent was clearly anticipated by the Hazelton patent, No. 243,554. This patent shows a separation saw with a protected point and the edges of the throat meeting at an acute angle, as indicated by Figure 4. It was granted June 28, 1887, and expired on the 28th day of June, 1889. In describing the steel disks in this patent the patentee says:

"The teeth at the peripheries of the steel disks are bent inward in such manner that they will readily pass over any unyielding body, but will seize the fibers of the cotton and strip it from the bolls."

It is significant that when Benthall's application was pending in the Patent Office no claims were allowed by the examiner, saw claims being allowed by the board of examiners in chief on appeal, and it appears that this was done upon the express representation that a cotton gin saw would not stem peanuts. In referring to cotton gin saws the board stated in its decision that they were "incapable of stemming peanuts." It was shown by the testimony in this case that gin saws had been used to stem peanuts, and also by experts that the Hazelton saws would successfully stem peanuts. Bearing upon this point Mr. Pope stated that the saws disclosed by the enlarged photolithographs of the Hazelton patent, No. 313,421, would stem peanuts. Among other things, he said:

"Q. I hand you a, picture of a different saw 6½ inches in diameter, and also a picture of this sort of saw 10 inches in diameter, and ask you to state, from a practical standpoint, if, in your opinion, saws made in exact accordance with these pictures, and having teeth identical in size and shape with the teeth shown in these pictures, would, or would not, such saws be capable of being used to stem peanuts. A. Yes; or any other circular saw not having sufficient space between each tooth to take in the peanuts and crack them to pieces. * * * Q. About how long have you been acquainted with saw machines for stemming peanuts? A. Let me see; let me see; you have got to give me a little time to study now. This is 1914. About the year 1899 I saw peanuts thrashed off over a barrel, and these same peanuts run through an old cotton gin fed in the same manner as cotton is fed in the gin by hand, and was fairly successful in pulling the stems off of the peanuts that were thrashed off over the flour barrel heads. And the idea was conceived at that time by me that the saw stemming device could be made to operate in a successful and satisfactory manner. That's sufficient, I think."

In referring to the photolithographs of the Hazelton patent, No. 233,-554, this witness also said:

"Q. I hand you a picture of a saw 6½ inches in diameter and a picture of a similar saw 10 inches in diameter, and ask you to state from a practical standpoint if, in your opinion, saws made in exact accordance with these pictures, and having teeth identical in size and shape of the teeth shown in these

pictures, would, or would not, such saws be capable of being used to stem peanuts. A. Yes; with my knowledge and experience of about 15 years I am positive that such saws would stem peanuts successfully. That's all."

W. E. Slavin, who testified that he was a practical peanut machinery mechanic, in referring to this phase of the question, said:

"Q. I hand you four sheets of paper marked Defendant's Exhibits D3, D4, D5, and D6. Each of these pieces of paper includes a picture of a saw. I ask you to state from a practical standpoint if saws made exactly in accordance with each of these pictures, whether or not such saws could be used to stem peanuts; that is, could or could not such saws be used in a peanut stemmer? A. I don't see why they wouldn't pull stems. It looks to me like they would pull stems as good as any. Q. Were you referring to one picture or to all four pictures in the previous answer? A. Referring to all of them, but I think these two (witness refers to Exhibits D3 and D4) would be a little better than those two (witness now refers to Exhibits D5 and D6). They will all stem peanuts."

Among other things, Frank Lummis, of the firm of Lummis & Co., peanut cleaners, testified that his firm, prior to 1906, had used a regular cotton gin to stem peanuts. His testimony is as follows:

"Q. Did you use anything in this factory to stem peanuts before you used the machine you have just described? A. We did; the same being a regular cotton gin. Q. Am I correct in understanding that you used a cotton gin to stem peanuts? A. You are. Q. Was this cotton gin modified in any way when it was being used to stem peanuts; that is, was its construction changed or was it not? A. No; the machine was not changed."

[2] It is strenuously insisted by complainant that the ruling of the officials of the Patent Office as experts is conclusive. In the case of Reckendorfer v. Faber, 92 U. S. 347, 23 L. Ed. 719, the court in the first syllabus said:

"The decision of the Commissioner of Patents in the allowance and issue of a patent creates a prima facie right only; and, upon all the questions involved therein, the validity of the patent is subject to examination by the courts."

That the officials of the Patent Office are theoretical experts is undoubtedly true, but it should also be borne in mind that from the very nature of things they must accept the statement contained in the application as being true except in a case where such statement is contradicted. No doubt, if it had been made to appear to the Patent Office officials that cotton gin saws would stem peanuts, the claim of complainant would have been rejected. However, this court is not bound by the findings of the officials of the Patent Office based upon ex parte testimony. A careful examination of the record discloses the fact that no witness with practical experience was produced by the complainant to sustain its contention on this point. The complainant relies upon the opinion expressed by Mr. Brandenburg, an expert, that the saws patented by Hazelton would not stem peanuts, and that a cotton gin is not an analogous machine to a peanut stemmer. The witness Brandenburg, while testifying as an expert, practically admitted his disqualification to testify as such. Among other things, he testified as follows:

"Q. In your analysis of the various constructions under consideration you have expressed your opinion as to what would be obvious to the 'mind of the ordinary skilled mechanic.' Do you consider yourself a skilled mechanic?

A. No. Q. You have referred to the patent to Harris, No. 30,293, as having nothing in common with the invention in the Benthall patent, and in your deposition you have referred to 'the inventive mind.' Are you an inventor? A. I do not regard myself as such. Q. Have you ever worked as a mechanic in any shop? A. No. Q. Are you a graduate of a technical school? A. No. Q. Were you ever a member of the examining corps of the United States Patent Office? A. No. Q. In your discussion of the various mechanisms you have referred to cotton gins. Have you ever seen a cotton gin in operation? A. No. Q. Have you ever seen a cotton gin? A. No. Q. Then you have not seen in operation stemming saws identically like that shown in Fig. 3 of the Benthall patent, No. 890,401, in suit? A. No."

The following question and answer is to be found at the close of Brandenburg's testimony:

"Q. Throughout your deposition you have analyzed constructions showing in a number of patents. Have you ever seen in operation any machine built in absolute strict accordance with the exact structure disclosed in any of the patents you have discussed? A. No."

[3] It is insisted by complainant that a new combination of old things may be patentable, and in support thereof cites the cases of Loom Co. v. Higgins, 105 U. S. 580, 26 L. Ed. 1177; Seymour v. Osborne, 11 Wall. 516, 20 L. Ed. 33; "The Barb Wire Fence Patent," 143 U. S. 275, 12 Sup. Ct. 443, 36 L. Ed. 154; Bates v. Coe, 98 U. S. 31, 25 L. Ed. 68; Hobbs v. Beach, 180 U. S. 383, 21 Sup. Ct. 409, 45 L. Ed. 586; National Hollow Brake-Beam v. Interchangeable Brake Beam, 106 Fed. 693, 45 C. C. A. 544.

This rule is well-established, but in the case upon which it relies the combination is new, and the result of the combination of the old elements is also new. In the case at bar there is no co-operation between the elements; the throats having their sides meeting at an angle. A protected point is disclosed in Hazelton's patents, and is therefore not new. Wedge-shaped throats are disclosed in the Hazelton patent, No. 253,554, and the Scott patent, No. 125,338, is also old. There being no co-operation between these functions, we have the result that each must act in the old way; the joint product being aggregation of the old result, which, under the rule, is not patentable.

In the case of Hailes v. Van Wormer, 20 Wall. 353, 22 L. Ed. 241, the Supreme Court, in referring to a patent on a stove claiming in combination fire pot, magazine, and draft opening, in the third syllabus said:

"No one, by bringing together several old devices without producing a new and useful result, the joint product of the elements of the combination and something more than an aggregate of old results, can acquire a right to prevent others from using the same devices, either singly or in other combinations, or, even if a new and useful result is obtained, can prevent others from using some of the devices, omitting others, in combination."

This court, in the case of Ball et al. v. Coker et al., 210 Fed. 278, 127 C. C. A. 126, held a patent invalid as being an aggregation, and in discussing the question Judge Connor said:

"The distinction between a 'combination' and an 'aggregation' lies in the presence or absence of mutuality of action. * * * To be patentable the combination of all elements or devices must form either a new machine of a distinct character and function, or produce a result due to the joint and co-

operating action of all the elements. * * * Otherwise it is only a mechanical juxtaposition, and not a vital union."

However, it is insisted by complainant that the doctrine of "aggregation" does not apply to a single device such as a saw. In the case of Knight v. Rieger (D. C.) 203 Fed. 49, District Judge Rose said:

"He relies on the familiar rule that a new combination of several old things may be patentable. It is not in any wise suggested in the evidence that the projecting tongues of the crypt shelves in complainant's device play any part in ventilating or draining the crypts. That system of ventilation will work just as well whether the shelves are secured in the back wall or not. * * *

"The crypts are drained and ventilated precisely as they were in the prior art. The shelf is secured in the back wall in the way in which many shelves time out of mind have been secured in all sorts of structures. Under such circumstances what the patentee claims is not a combination but an aggregation. * * *

"In view of the admitted state of the prior art, I can find nothing even remotely suggestive of invention in anything which the plaintiff claims to have done."

The decision of Judge Rose was affirmed by this court. Knight v. Rieger, 212 Fed. 935, 129 C. C. A. 455. The court in its opinion, among other things, said:

"In other words, as appears to us, appellant merely brings these two factors into juxtaposition and concurrent use; but does not in fact produce any new or novel combination within the meaning and intent of the patent law. As we see the matter, it comes in reality to the question of the relative desirability of different modes of construction neither of which involves any display of inventive genius."

Also in the case of Dodge Manufacturing Co. v. Collins, 106 Fed. 936, 46 C. C. A. 53, this court said:

"The effect of this use of old devices in the construction of the McNeal split wood pulley was to strengthen it, and thus add to its durability; but it did not produce a new effect or result. The doctrine that a combination of old devices in a patent to be sustained must produce a new result is thus stated in Reckendorfer v. Faber, 92 U. S. 347 [23 L. Ed. 719]: 'The combination, to be patentable, must produce a different force or effect, or result in the combined forces or processes, from that given by their separate parts. There must be a new result produced by their union. If not so, it is only an aggregation of separate elements.'"

This court in the case of Gale Manufacturing Co. v. May, 229 Fed. 575, 143 C. C. A. 613, also announced the same rule. This case is directly in point as respects the saw of the Benthall patent. It appears that the saw is old in the art, and also appears that there is no co-operation function between the protected point and the gullet and the throat, formed by the sides of the teeth meeting at an acute angle. From what we have said we are of opinion that the Benthall saw cannot be the subject-matter of a valid patent.

However, we deem it proper that we should discuss certain other phases of the case which we think are very material in view of the evidence offered in the court below.

It is insisted by the defendant that, if the Benthall patent is sufficiently broad to cover different saws, then the Benthall patent, No. 890,401, filed January 12, 1906, is anticipated by a saw in use by P. D.

Gwaltney in his peanut cleaning factory at Smithfield, Va. It is also insisted by defendant that, if we take either horn of the dilemma, complainant would be precluded from recovering in this suit; that is to say, the Gwaltney saw stands between the Benthall patent and the defendant's saw, "and that either the Benthall patent is anticipated by the Gwaltney saw or the defendant's saw does not infringe the Benthall patent." The learned judge who heard this case in the court below found as a fact that the Gwaltney saw was in use on December 3, 1905, but he further found that the Benthall patent had been marketed at an earlier date. It is insisted by counsel for defendant that the court below should have taken into consideration the fact that the Benthall patent is for a specific kind of saw, and that Benthall himself was on the witness stand, but failed to testify concerning this saw or any other of the Benthall patents, and it is further insisted that it was clearly shown by the testimony that gin saws would stem peanuts, and that in the early Benthall machine types of gin saws were used.

The witness Hunter, a traveling and mechanical engineer who had been employed by the Cardwell Machine Company for about 19 years, testified on behalf of the defendant, and, among other things, said:

"Q. Did these peanut stemmers include in their construction any kind of saw? A. They did. Q. What kind of saw was it? A. I never saw any kind of saws used in the experiments except different size saws, which are termed gin saws. The sizes of saw mostly used, to the best of my knowledge, were six-inch diameter saws."

He also testified that:

"Q. At any time during these experiments at the Cardwell Machine Works did Mr. Benthall experiment with anything other than a sharp tooth saw? A. To the best of my knowledge he did not, as I was constantly in all departments of the shop."

This witness, among other things, produced a blueprint of the Benthall stemmer. It clearly showed short-pointed gin saws. The witness stated positively that Benthall used only the gin saw type in the machines built by the Cardwell Machine Company. This testimony referred to transactions in 1905. It is significant that Mr. Benthall, who testified in his own behalf, did not dispute this fact.

It is further insisted by defendant that it has shown by Hunter that the original Gwaltney machine or saw was kept at the Cardwell Machine Company plant, where it might have been seen by Benthall. The witness in referring to this point said:

"The saw with the square hole that is before me was kept in such a place that Mr. Benthall or any of our workmen could have seen it if they cared to do so. It was not under lock and key."

It appears that this witness was wholly disinterested, and there is nothing in his evidence to indicate that he was actuated by partisan bias in the slightest degree. The witness Evans, introduced by complainant, testified that machines built by the Cardwell Company were similar to "Defendant's Exhibit, Blueprint Drawing No. 903, Benthall Stemmer." However, he later testified that the teeth used in the Benthall machines were blunt.

It is insisted that the witness Evans did not testify that the teeth were blunt until he was asked a leading question. The following questions and answers are relied upon by defendant to show that this testimony was obtained under an examination which was leading in its character:

"Q. Will you please state how the peanut stemmers which you built for Mr. Benthall while you were with the Cardwell people compared in construction to the machine shown in that blueprint? A. They were like that blueprint very nearly. Q. Can you remember how they differ, if at all, from the machine shown in that blueprint? If so, please state. A. I don't see any difference. Q. Did those machines have saws with teeth like those shown in the blueprint? A. No: the difference is the blueprint shows sharp teeth. Q. How were the teeth of the saws in the machines? A. They were blunt teeth."

Complainant insists that the exact saws of the Benthall patent were in machines made by the Cardwell Machine Company and shipped as early as August, 1905.

The defendant put in evidence two of the saws used by Benthall to sustain its contention that the early saws used by Benthall were gin saws. Witness Cockes testified as follows on this point:

"Q. Were the points of the teeth in this stemmer sharp protruding points similar to saw teeth in a cotton gin saw? A. Similar; yes, sir. Q. That is, I understand you to mean the points of the teeth were sharp so that if your hand came in contact with the saw the teeth would cut the flesh? A. They were not made with a cutting edge. Q. You probably misunderstood my question. I was inquiring more particularly with reference to the point itself; that is, did the point stick up out from the saw in the manner of a cotton gin saw tooth? A. I am not very familiar with a cotton gin saw, but this saw had rather a rounded point to prevent cutting the nuts, I should suppose. It was as sharp as you could have it not to cut the peanut. * * * Q. Referring to the saw in the stemming mechanism, you state that points of the teeth of the saw are rounded. What do you understand to be the purpose of this construction? A. To prevent scratching the hulls, I suppose."

Witness Felton also testified as follows:

"Q. Did you examine the saws particularly? A. The teeth were not very sharp and made something like the teeth of a cotton gin."

Witness Evans, further testifying, said:

"Q. What kind of saws did they have on that mandril? A. A saw six inches in diameter. Q. Were they any particular kind of saws with which you were familiar? A. It was a saw I was not familiar with. Q. After you built that machine what did you do with it? A. Tried to stem peanuts with it. Q. Well, what happened; did you stem peanuts with it? A. Yes; we stemmed peanuts and broke peanuts, too. Q. What do you mean by breaking peanuts? A. Breaking the pods. Q. What caused that machine to break peanuts, if you know? A. The points to the saw teeth were too sharp. Q. Was anything done to prevent the saws from breaking peanuts; if so, what? A. Yes; we ground off the points of the teeth. Q. Who ground off the points of the teeth? A. Mr. Benthall and myself. Q. After grinding off the points of the teeth, how did the saws act? A. They did very satisfactory work. * * * Q. What kind of saws did these other stemmers have in them? A. Six inches in diameter with a blunt tooth. Q. Were the teeth of these saws ground down by you or Mr. Benthall? A. No. * * * Q. Were six-inch saws used in all the peanut stemmers you built for Mr. Benthall? A. Yes. Q. Are you sure that you did not build any stemmers using ten-inch saws? A. Yes. * * * Q. Since you have been with the Benthall Machine Company at Suf-

folk, Va., have they always used stemming saws having exactly the same kind of teeth? A. Yes."

Evans also testified that:

"Q. What size saws were used in the single mandril stemmer which you built for Mr. Benthall at the Cardwell Machine Company's works? A. Six-inch. Q. You have stated that those were saws of a kind of which you were not familiar. Please explain what you meant by that statement? A. I mean I had never seen a saw of that make before. Q. What was there peculiar about these saws? A. They had fine pointed teeth. * * * Q. How much space was there between the points of the teeth of the saws used in this stemmer; I mean the distance from one point to the adjacent teeth in the same saw? A. I don't exactly know; something like five-sixteenths of an inch. Q. Am I correct in understanding you that the saws used in the single mandril stemmer had sharp pointed teeth? A. When it was first made it had. Q. Were the points of the teeth ground off, or did you put new saws in this single mandril stemmer? A. The points were ground off. Q. Did the Benthall Machine Company, to your knowledge, ever build any stemmers using 6½ saws? A. No."

Witness Cockes also further testified:

"Q. What kind of teeth did those saws have? A. They had teeth much like those now in use, but smaller and with rounded points. * * * Q. Do you know whether or not they have used the same kind of saw in all the types of their machines with which you are familiar? I am referring to the stemming saws. A. They have used much the same saw with different kinds of teeth, different sizes of teeth, I should have said. Q. Have they used saws of different diameters, so far as you know? A. Yes, sir. Q. What size would you say the different diameters of the saws are that they have used? A. About six and seven inches. Q. Am I correct in understanding you that they have used saws of about six inches in diameter, and that they have also used saws about seven inches in diameter? A. Yes, sir. Q. About what distance would you estimate, from recollection, as being the distance between the points of adjacent teeth on the same saw, on the saws which were in the first machine that you bought, that is, the 1905 machine, about which you have testified? A. I know that they were a little smaller than the teeth on the saws which they use now. They were about like a small cotton gin saw. I am not very familiar with cotton gins. I should say an eighth or three-sixteenths of an inch between the points."

Witness Roundtree, in referring to this point, said:

"Q. What kind of teeth were on those saws? A. It had teeth something like they have got now, only they were a little smaller than they use now. * * * Q. Mr. Roundtree, you were in this room when Mr. Cockes was giving his testimony, were you not? A. Yes, sir. Q. And you heard him testify, did you not? A. I did. * * * Q. Did you ever see a cotton gin saw? A. Yes, sir. Q. Were the saws in this stemmer similar to a cotton gin saw? A. They were smaller than a cotton gin saw. Q. Were the teeth of the saws similar to those of a cotton gin saw? A. The teeth were larger than a cotton gin saw."

[4] We have carefully considered the evidence bearing on this point, and are of opinion that such contention is not sustained. The fact that Benthall was a witness, and, as we have already stated, did not dispute the contention of defendant as respects this point, is a strong circumstance to be considered in determining the point at issue. The evidence, taken as a whole, appears to be conclusive. The date of the Gwaltney saw was established beyond a reasonable doubt, which places upon the complainant the burden of showing that the Gwaltney saw

was anticipated. It has been held that evidence of this character cannot be overcome by oral testimony alone. The case of Deering v. Winona, 155 U. S. 286, 15 Sup. Ct. 118, 39 L. Ed. 153, is very much in point. In that case the court, among other things, said:

"Granting tho witnesses to be of the highest character, and never so conscientious in their desire to tell only the truth, the possibility of their being mistaken as to the exact device used, which, though bearing a general resemblance to the one patented, may differ from it in the very particular which makes it patentable, is such as to render oral testimony peculiarly untrustworthy; particularly so if the testimony be taken after the lapse of years from the time the alleged anticipating device was used. If there be added to this a personal bias, or an incentive to color the testimony in the interest of the party calling the witness, to say nothing of downright perjury, its value is, of course, still more seriously impaired. This case is an apt illustration of the wisdom of the rule requiring such anticipations to be proven by evidence so cogent as to leave no reasonable doubt in the mind of the court that the transaction occurred substantially as stated."

This quotation is very much in point as respects complainant's testimony, inasmuch as the witness Evans was its foreman, and Cockes testified that he was an agent of the same company. Also the cases of Mast v. Dempster, 82 Fed. 327, 27 C. C. A. 191, National Hollow Brake Beam Co. et al. v. Interchangeable Brake Beam Co., 106 Fed. 693, 45 C. C. A. 544, Buser v. Novelty Co., 151 Fed. 478, 81 C. C. A. 16, Lein v. Myers, 105 Fed. 962, 45 C. C. A. 148, and Washburn v. Beat 'Em All Barbed Wire Co., 143 U. S. 275, 12 Sup. Ct. 443, 36 L. Ed. 154, are to the same effect.

[5] The complainant attacks the Gwaltney saw as being an abandoned experiment, contending that the original Gwaltney stemmer was provided with a wooden bed having slots therein, and the saws extended through the slots, that this construction is impractical, in that the stems of the peanuts wore the edges of the slots to such an extent that they thereby became too large, and that to remedy this defect the stemmers at a later date were equipped with steel beds. Upon this ground it is insisted that the original Gwaltney patent was an abandoned experiment.

We think this is not germane to the question now before us; the real question here being as to whether the Gwaltney patent used a certain kind of saw, and as to whether these saws were in use in 1905, and continued until 1914, as appears from the evidence of G. W. Gwaltney, Sr. We fail to see how the substitution of steel beds could in any wise affect the question as to whether a particular kind of saw was in use at that date. In the case of Sydeman & Meade v. Thoma, 32 App. D. C. 362, the court said:

"In other words, it is sufficient reduction to practice, although a more desirable commercial result may be obtained by some simple and obvious mechanical improvement, or by substituting another well-known material for the one used in the original construction, as, for example, metal for wood, cast metal for sheet metal, and the like. Coffee v. Guerrant, C. D. 1894, 384, 68 O. G. 279, 3 App. D. C. 497, 499; Norden v. Spaulding, C. D. 1905, 588, 114 O. G. 1828, 24 App. D. C. 286, 290; Smith v. Brooks, C. D. 1904, 672, 112 O. G. 953, 24 App. D. C. 75, 80; Andrews v. Nilson, C. D. 1906, 717, 123 O. G. 1667, 27 App. D. C. 451, 457; Lowrie v. Taylor, C. D. 1906, 713, 123 O. G. 1665, 27 App. D. C. 522, 526; Burson v. Vogel, C. D. 1907, 669, 131 O. G. 942, 29 App. D. C. 388, 394; Howard v. Bowes, 31 App. D. C. 619, 622."

Of course, if it had been shown that the Gwaltney patent was merely tried as an experiment and abandoned because it did not perform the function for which it was intended, such evidence would be conclusive. But such is not the case. It was shown that the Gwaltney saw was completed, and not only capable of being used, but was used for the purpose intended, and it further appears that it was in use on January 30, 1914.

The real question involved here is as to whether defendant by the use of its saw has infringed the patent of complainant, and in order to determine this question, among other things, it becomes necessary to ascertain whether anterior to the date when complainant began to use this saw a similar saw was in use by defendant; it appearing, as it does in this instance, that where a continued use of a device that is not changed in principle is shown, such device cannot be deemed to be an abandoned experiment. In the case of Buser et al. v. Novelty Tufting Machine Co., 151 Fed. 478, 81 C. C. A. 16, the court in the first syllabus said:

"Where the idea of a machine has been conceived, and the conception carried into effect by the construction of the machine, which is used, or is capable of being used, for the purpose for which it was designed, it is no longer an experiment, but an invention; and the subsequent abandonment of the use of the machine does not render it an abandoned experiment, nor lessen its effect as an anticipation which will invalidate a subsequent patent to another for * * * the same machine."

It is also contended by complainant that it has discredited the original Gwaltney saw by the evidence introduced by the witness Hunter designated as "Hunter slip No. 2." It appears that this slip was obtained from the Diston Saw Company, and that it bears the notation, "This does not work satisfactory." By this evidence it was intended to convey the idea that the Gwaltney saw was not capable of performing satisfactory work. Witness Hunter, in referring to this matter, testified as follows:

"Q. Please compare Hunter slip No. 1 with defendant's exhibit, Gwaltney original saw, and state whether or not that stamped impression was made from that saw. A. It was not."

In the first place there is no evidence which tends in the slightest degree to connect this "slip" with the Gwaltney saw, and of course under such circumstances it is wholly irrelevant, and can have no bearing upon the questions involved in this case. The court below held that the Gwaltney saw was a completed invention on the 31st day of December, 1905. This fact was established by record evidence sufficient to satisfy any one beyond a reasonable doubt as to its verity, and in this connection it should be borne in mind that complainant offered no evidence to show that the Benthall saw had been manufactured or used prior to 1913. However, it is insisted by defendant that, even if it should appear that the Benthall patent was not anticipated by the Hazelton and other patents, the evidence shows that there is no infringement of the complainant's claims.

It is insisted by complainant that the Benthall patent, No. 890,401, is built upon the edges of the throat of the teeth meeting at an acute

angle to wedge or hold the peanut stem. Lines 59 to 71 of the Benthall patent are in the following language:

"It will be noticed from inspection of Fig. 3 that the sides of the throat meet each other at an acute angle, and that the front edge of each tooth is straight, and that the widest part of the throat is approximately the width of the tooth. By this construction the stems when engaged by the throat are drawn to the bottom hereof, and the gradual narrowing of the throat exerts a wedging action on the stem, thus gripping the same sufficiently tight to draw it between the slats and to strip the nuts therefrom."

The claims involved in the present suit are:

"(4) In a peanut stemmer, a stemming device comprising a disk provided on its periphery with a plurality of teeth, said teeth being inclined to radii of the disks, and having their front edges straight, the edges of the adjacent teeth meeting at an acute angle, and the points of the teeth being nearer the centers of the disks than the heels thereof, and the spaces between the teeth being of a width at the widest part approximately equal to that of the tooth.

"(5) In a peanut stemmer, a stemming device comprising a disk provided on its periphery with a plurality of spaced teeth having straight front edges, the heels of the teeth being farther from the centers of the disk than the points thereof, whereby to form a guard for the point, and the edges of the adjacent teeth meeting at an acute angle whereby to exert a wedging action on the stem."

An examination of defendant's saw will show that it does not conflict with the claims of complainant. In other words, the complainant lays stress upon the fact that "the edges of the adjacent teeth meeting at an acute angle whereby to exert a wedging action on the stem."

Defendant contends that its patent is so constructed as to avoid the wedging of the peanut stems between the teeth, inasmuch as such action clogs the teeth, and it further insists that the sides of the throat of its saw do not meet at an acute angle. Bearing upon the prior use of this saw, defendant calls attention to the fact that the Eli Whitney cotton gin is similarly constructed, and that this patent was in use for more than 110 years anterior to the time Benthall applied for the patent in suit; that the Gwaltney saw, which it was shown was used prior to the Benthall patent, is identical with that of defendant.

In Gwaltney's patent, No. 828,736, in which he secured a patent on a saw, his specifications state:

"The sides of the body of the teeth are straight, and instead of a sharp angle being formed between them at the gullet or throat the latter is broadened and made round or straight for the purpose of preventing the peanut stem wedging and choking in the throat, as they would otherwise be liable to do. In other words, the width of the throat or gullet is made equal to the usual diameter of a peanut stem, so that the latter may escape freely therefrom in case of lodgment."

It appears from the evidence that Munn & Co. acted as solicitor in securing the Benthall patent as well as the patent for Gwaltney, and it further appears that these patents were examined by the same examiner, from which it is reasonable to infer that the Patent Office considered and treated them as being entirely different. Justice Shiras, speaking for the Supreme Court in the case of Boyd v. Janesville Hay Tool Co., 158 U. S. 260, 15 Sup. Ct. 837, 39 L. Ed. 973, said:

"As both applications were pending in the Patent Office at the same time, and as the respective letters were granted, it is obvious that it must have

been the judgment of the officials that there was no occasion for an interference, and that there were features which distinguished one invention from the other."

The complainant relies upon the testimony of the witness Brandenburg, who, as we have stated, testified that he was an expert, but admits that he was not a technical expert, nor had ever been a member of the examining corps of the United States Patent Office. He further admitted that he was not an inventor and had never seen a cotton gin in operation, and that he never saw in operation a stemming saw like the Benthall patent, nor had he seen any machine in operation that had been built in strict accordance with any of the patents to which he referred.

[6] It is well settled that infringement, which is a tort, cannot be established by evidence which is speculative in its character, and this is especially true where a witness who attempts to testify as an expert does not possess the qualifications of an expert. In the case of Fried-Krupp-Aktien-Gesellschaft v. Midvale Steel Co., 191 Fed. 588, 112 C. C. A. 194, Judge Buffington, speaking for the Circuit Court of Appeals for the Third Circuit, said:

"We deem it proper, however, to say for the guidance of patent practitioners in this circuit that it should be borne in mind that infringement is not only a question of fact, but is a tort or wrong, the burden of establishing which, as in all torts, clearly rests on those who charge such wrong. The absence of actual fact proof is not met by the presence of expert speculations no matter how voluminous. * * *

"The province of such expert testimony is to remove uncertainty where the terms used are obscure, and is not to create uncertainty where the language is plain. * * *

"But infringement is a tort, the burden of establishing which is on him who charges it. To produce confused and uncertain testimony in that regard will not suffice."

It should also be borne in mind that this witness, among other things, testified that he did not find a "wedging action" in defendant's saw. In referring to this point he said:

"Q. In the operation of the stemmers of the National machine, and also of the Ferguson machine, did you observe whether or not there was any 'wedging action' taking place with reference to the stems? A. Under the conditions of operation it was impossible to observe this action or the absence of it."

On the other hand, the expert introduced by defendant, about whose qualification there can be no question, said:

. "In this operation I find the distance between the opposing adjacent edges of the teeth even at the bottoms of the gullets is so great that the stems will not wedge therein, but will drop freely from the said gullets when the stems are separated from the peanuts. This, of course, is for the reason that the width of the gullets from their tops to their bottoms is greater than the cross-sectional area or diameter of the peanut stems.

"In connection with the above explanation of the operation of the machine in question, I may say that I have seen and carefully examined one of the machines when it was in operation, and when at a standstill. I have also examined others of these machines, some of which were completed and some of which were in course of construction. I have furthermore taken peanut stems and attempted to wedge them in these gullets, but they will not wedge therein."

The evidence to which we have referred clearly establishes the fact that the defendant's saw is different from the complainant's saw both in function and structure, viz., the sides of its throat do not meet at an acute angle, and there is no wedging action of the stems in their throats.

A careful analysis of the testimony leads us to the conclusion that the court below erred in its construction of the claims of the Benthall patent. In other words, we think that its construction extends the claim of the complainant beyond the scope of its patent, and that such construction is in conflict with the oral as well as the written testimony bearing upon this point.

[7] The evidence in this case clearly shows that Benthall was persistent in his contention that in order to properly stem peanuts it was necessary that the sides of the teeth should "meet at an acute angle," and there is nothing to indicate that it was his purpose to carry his claim beyond what he contended at the time. Where one seeks a patent by which he is to secure a monopoly of the use of the machine proposed to be patented, such applicant is required to describe specifically and with great care the nature of his invention. Otherwise the patent could be construed from time to time by enlarging its scope so as to meet any exigencies that might arise. One who seeks a patent must necessarily do so with the understanding that he is dealing with the public at large. In other words, that he is entering a realm wherein the rights of the public are involved, and it is upon this theory that he is required to clearly define the scope of his invention. White v. Dunbar, 119 U. S. 47, 7 Sup. Ct. 72, 30 L. Ed. 303. The case of Evans v. Eaton, 7 Wheat. 365, 5 L. Ed. 472, is very much in point. In that case Justice Story, in discussing this phase of the question, said:

"The other object of the specification is to put the public in possession of what the party claims as his own invention, so as to ascertain if he claim anything that is in common use, or is already known, and to guard against prejudice or injury from the use of an invention which the party may otherwise innocently suppose not to be patented. It is therefore for the purpose of warning an innocent purchaser or other person using a machine of his infringement of the patent; and at the same time of taking from the inventor the means of practicing upon the credulity or the fears of other persons, by pretending that his invention is more than what it really is, or different from its ostensible objects, that the patentee is required to distinguish his invention in his specification. Nothing can be more direct than the very words ⋆ ⋆ ⋆ 'in such full, clear, and distinct terms as to distinguish the same from all other things before known.' "

Also in the case of McClain v. Ortmayer, 141 U. S. 419, 12 Sup. Ct. 76, 35 L. Ed. 800, the Supreme Court said:

"The object of the patent law in requiring the patentee to 'particularly point out and distinctly claim the part, improvement or combination which he claims as his invention or discovery' is not only to secure to him all to which he is entitled, but to apprise the public of what is still open to them. The claim is the measure of his right to relief, and while the specification may be referred to to limit the claim, it can never be made available to expand it."

There are numerous other cases wherein the Supreme Court has announced this principle. In this circuit, in the case of Imperial Bottle

Cap & Machine Co. v. Crown Cork & Seal Co., 139 Fed. 312, 71 C. C. A. 442, Judge Brawley, speaking for the court, said:

"As we have already said, each element of a combination as described and claimed is thereby made an essential feature, and one of the operative means, and cannot be repudiated by the patentee. So, when Painter said that the shoulder must be a certain distance below the mouth of the bottle, and that there must be a resiliently compressible disk, he cannot be heard now, after another invention has taught how they may be dispensed with, to say that neither of these features is essential. Identity depends not merely upon the function performed, but upon the manner in which it is performed, and the supposed infringer does not infringe if he omits any of the elements which the patentee has described as essential; nor is he permitted to block the path of improvement or invention by claiming matters unessential."

This court in the case of Tate Manufacturing Co. v. Baltimore & Ohio Railroad Co., 229 Fed. 141, 143 C. C. A. 417, held that a court could not read into a claim a feature so as to extend its scope beyond the claim upon which the patent was issued.

The limitations of Benthall's claims as to structure and function are well defined and unmistakable as to their scope. The evidence on this point impels us to the conclusion that there is nothing contained therein corresponding either in function or structure to defendant's saw. Therefore it necessarily follows that such claims are not infringed by defendant, nor do we think that the complainant has succeeded in its effort to establish the fact that the earlier use of the Benthall saw antedates the Gwaltney patent. The evidence offered by the defendant in this respect not only repels the contention of complainant, but, we think, clearly establishes the contention of the defendant. In view of what we have said, in our opinion the court below erred in holding that defendant's machine infringed the patent of complainant.

[8] Great stress in the brief of complainant, as well as the argument, is laid upon the alleged fact that commercial use in this instance should turn the scale in its favor. We do not think this a safe criterion to guide us in ascertaining the questions presented to us in this case. In the case of McClain v. Ortmayer, supra, 141 U. S. 419, 12 Sup. Ct. 76, 35 L. Ed. 800, Mr. Justice Brown said:

"That the extent to which a patented device has gone into use is an unsafe criterion even of its actual utility is evident from the fact that the general introduction of manufactured articles is as often effected by extensive and judicious advertising, activity in putting the goods upon the market, and large commissions to dealers as by the intrinsic merit of the articles themselves. * * * If the generality of sales were made the test of patentability, it would result that a person by securing a patent upon some trifling variation from previously known methods might, by energy in pushing sales or by superiority in finishing or decorating his goods, drive competitors out of the market and secure a practical monopoly, without in fact having made the slightest contribution of value to the useful arts. * * * While this court has held in a number of cases, even so late as Magowan v. New York Belt. & Pack. Co., 141 U. S. 332 [12 Sup. Ct. 71, 35 L. Ed. 781], decided at the present term, that in a doubtful case the fact that a patented article has gone into general use is evidence of its utility, it is not conclusive even of that— much less of its patentable novelty. * * *"

Thus it will be seen that commercial success alone is not sufficient where it is sought to prove an invention. This rule is based on com-

mon sense, and we find nothing in this case to take it out of the rule announced in the above case, which we have just quoted.

We have considered the cases cited to sustain complainant's contention, but are of opinion that they do not apply to the case at bar.

[9] As we have already stated, the court below dismissed complainant's bill as to the Jones' patent, No. 908,271, holding this patent to be anticipated and invalid. The complainant filed a cross-appeal in which it contends that the court below was in error in this respect. The court below held that the Jones patent is simply an improvement of an old art, that all the elements of the Jones patent are disclosed in a substantially similar organization of such patent, and that therefore any variation between the Jones patent and the prior patented art represents purely mechanical skill and cannot be treated as an invention. The court below based its decree upon the fact that a machine containing every element of the Jones patent was used in Pope's factory at Suffolk, Va., for more than two years prior to the date when application was filed for the Jones patent; further, that it stemmed about 10,000 bags of peanuts; that this machine clearly anticipated the Jones patent.

In referring to the Jones patent the court below, among other things, said:

"The Pope stemmer, in the judgment of the court, cannot be treated as an abandoned experiment. The machine was a complete one. There is no element of uncertainty as to its use, and no attack was made on the witnesses, nor effort to controvert what they said. Indeed, its actual parts were before the court; it was in successful operation as a part of the regular equipment of the Pope factory, and used with profit; whereas the Jones device was never put in operation, though an unsuccessful attempt was made to build one of the machines. The Pope patent therefore constitutes a prior dedication to the public, invalidating the Jones patent, which has never been put into use."

The opinion of the court below is clear and comprehensive, and, being in full accord with the views expressed therein, we do not deem it necessary to enter into a further discussion of the merits of complainant's cross-appeal.

For the reasons stated, the decree of the court below, as respects the Benthall patent, is reversed, and, as to the Jones patent, it is affirmed.